SHIPCO 2295 INC., et al.,

v.

AVONDALE SHIPYARDS, INC.

SHIPCO 2295 INC., et al.,

v.

AVONDALE SHIPYARDS, INC.

SHIPCO 2295 INC., et al.,

v.

AVONDALE SHIPYARDS, INC., et al.

Civ. A. Nos. 82–5650 and
83–2494, 84–4361.

United States District Court,
E.D. Louisiana,
Section "A" Division.

March 25, 1986.

Antonio J. Rodriguez and Sean F. Murphy, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Shipco.

John V. Baus & Michael A. Chernekoff, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Avondale Shipyards, Inc.

John P. Hammond, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for Allgemeinr Elektricitats Gesellschaft Telefunken.

## AMENDED OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court on December 5 and 6, 1985, for summary nonjury trial and hearing on the motion of defendant AEG Telefunken for judgment on the pleadings. Having considered the testimony of the witnesses, the exhibits introduced at trial and the legal contentions of the parties, the Court rules as follows. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as conclusions of law; to the extent any of the conclusions of law stated below constitute findings of fact, they are so adopted.

### Introduction

These consolidated cases arise out of certain vessel construction contracts between defendant Avondale Shipyards, Inc. and Standard Oil Company (Ohio) [hereinafter "Sohio"]. At issue in Civil Action No. 83–2494 are certain hull stress fractures appearing in four vessels built by Avondale for Sohio, at issue in Civil Action No. 82–5650 is a propeller casualty sustained by one of the vessels (M/V ATIGUN PASS, Hull 2295); at issue in Civil Action No. 84–4361 are certain steering mechanism failures experienced by the four vessels.

The issues forming the subject of this opinion were originally brought before the Court by Avondale upon motion for summary judgment in connection with the three consolidated cases. Avondale there sought determinations that all claims with respect to the alleged vessel defects had been settled, that plaintiffs have no contractual causes of action against Avondale; that plaintiffs have no tort causes of action against Avondale as a matter of law; and that plaintiffs have no right of action in either contract or tort against Avondale. On June 20, 1985, the Court denied Avondale's motion for summary judgment by minute entry without a formal hearing, but to facilitate resolution of the issues implicit in the motion, the Court bifurcated two questions for trial:

A. Whether the original contracts were modified by certain warranties alleged to have been made by Avondale on August 17–18, 1976, and

B. The effect of an alleged compromise and/or accord and satisfaction of December 1981 upon any claim found to exist in light of the first stated matter to be tried.

Thereafter, AEG Telefunken, designer of the steering mechanism and named defendant in Civil Action No. 84–4361, joined the fray by filing a motion for judgment on the pleadings, which the Court set for hearing in conjunction with the bifurcated trial.

Pursuant to the minute entry, the parties submitted various stipulations, statements of fact, deposition testimony and exhibits. The issues were also extensively briefed. The matter proceeded to trial before the Court sitting without a jury on December 5 and 6, 1985, at which time the Court heard the testimony of Avondale representatives Richard Brunner, Darold Poulin, and Rene J. Meric, Jr.; and Sohio's Richard Whiteside.

The parties also submitted to the Court designated deposition testimony of Michael Harbottle, Ian Telfer, John Rutter, John Clinton, Daniel Melitz, and David Webb, all naval architects with BP Shipping Limited ["BP"], a subsidiary of British Petroleum Co. BP acted as Sohio's contract representative during vessel construction. Also submitted was the deposition testimony of James Cross, Purchasing Manager at Sohio from 1972 to 1977, chief Sohio negotiator

of the Sohio-Avondale construction contracts in 1974 and negotiator of a BP-Sohio "Supervisory Agreement" dated July 1, 1975.

Although Avondale's motion for summary judgment was filed in connection with all three consolidated matters, the alleged warranty modifications affect only the claims for structural failures experienced by the Shipco vessels and do not involve any claims made in Civil Action No. 82–5650 or Civil Action No. 84–4361. The alleged compromise and/or accord and satisfaction was, however, raised as a defense to all claims of purported vessel defects and has accordingly been so considered by the Court. The Court has also reconsidered all arguments raised in Avondale's original motion for summary judgment and plaintiffs' responses.

For the reasons set forth below, the Court determines there was no modification of the construction contract warranties[1] so as to afford plaintiffs a cause of action for breach of warranty due to the appearance of the stress fractures, and in any event, all claims arising out of the vessel construction were settled as a result of the Sohio-Avondale negotiations in 1981. Moreover, plaintiffs have no maritime tort causes of action against Avondale and AEG Telefunken as a matter of law, and the claims of SPC Shipping as time charterer are barred by *Robins Drydock* and its progeny. Accordingly, the Court rules in favor of Avondale on the warranty questions and dismisses plaintiffs' claims in light of the bifurcated trial. As to any remaining claims, Avondale's motion for summary judgment is well founded. The Court further grants the motion of AEG Telefunken for judgment on the pleadings.

*Findings of Fact*

The Court will first discuss its findings based upon the parties' stipulations. Thereafter, the Court will address the trial testimony and depositions, in light of the documentary evidence.

The corporate status of the parties is stipulated. On December 30, 1974 Sohio entered into six separate but identical contracts with Avondale for the construction of six tankers bearing Avondale Hull Numbers 2295–2300. Defects regarding Hulls 2295–98 are at issue in this litigation.

Prior to negotiating the Sohio-Avondale contracts, Sohio obtained technical assistance from naval architects and marine engineers at BP,[2] relying upon BP's experience in operating a tanker fleet. It is stipulated that BP was not involved in the execution or signing of the Sohio-Avondale contracts, which reflect the signatures of Mr. M. Lee Rice, Chairman of the Board of Avondale, and Mr. Frank Mosier, Vice-President, Supply and Distribution for Sohio. Following execution of the contracts, BP was designated as Sohio's contract representative pursuant to Article 5 of the Sohio-Avondale contracts and a "Supervisory Agreement" between BP and Sohio dated July 1, 1975. See Joint Exhibit 3; Joint Exhibit 6 (signed by Mr. Cross on behalf of Sohio; signature on behalf of BP illegible). Accordingly, BP provided technical advice to Sohio during its contract negotiations with Avondale and further represented Sohio in ongoing meetings and negotiations with Avondale during the course of construction. BP also reviewed and approved each of the many Avondale design and construction drawings on Sohio's behalf. See Joint Stipulations of Undisputed

---

**1.** Plaintiffs admitted they have no causes of action for breach of contract or for breach of express or implied warranties arising out of the construction contracts: "Plaintiffs no longer allege that they have causes of action in these suits for breach of contract or of express or implied warranties arising out of the Construction Contracts...." Rather, plaintiffs claim these contracts and warranties were superseded by Avondale's representations in August 1976 to

BP. See Memorandum in Opposition to Motion for Summary Judgment, p. 31, Document No. 39.

**2.** By 1978, BP acquired 52% of Sohio common shares. See Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment, Statement of Disputed Material Facts, p. 2 (attached to Document No. 39 in the record).

Facts, Document No. 55 [hereinafter "Stipulation"], Nos. 21–23.

Avondale and BP communicated modifications and approvals to Avondale's construction drawings by telex, letter and/or by conference. The many conferences resolving such matters were held either at Avondale's offices in Louisiana or at BP's office in London. BP prepared and distributed conference notes or minutes of the London meetings; Avondale prepared and distributed conference notes of the Louisiana meetings. Generally, Sohio was not sent copies of these notes. See Stipulation No. 29.

The Sohio-Avondale contracts contained certain builder's warranty provisions in Article 9[3] of the contracts.[4] Section (d) of Article 9, entitled "Limitations on Builder's Warranty," provides in pertinent part:

> The warranties, guaranties and remedies set forth in this Article 9 are in substitution of *any and all other* warranties, guaranties and *remedies* expressed or which might be implied (including but not limited to any implied warranties of merchantibility, fitness for a particular purpose and workmanlike services) with respect to the construction, delivery and sale of the Vessel; and Builder shall, following said delivery and sale, *in no event* be liable to Purchaser for the breach of *any* warranty, guarantee, or *remedy*, expressed or implied, in fact or in law, except as specifically hereinbefore set forth. *In no event*, shall Builder be liable to Purchaser for conse-

quential damages as a result of any such breach. Builder's total liability on account of liquidated damages for Performance Deficiencies and delayed delivery and on account of correction of Warranty Deficiencies shall not exceed $3,500,000.

Joint Exhibit 3, pp. 41–42 (emphasis added.)

The contracts merge all prior negotiations into the contract documents and state that no changes, amendments or modifications shall be valid unless reduced to writing and signed by the parties. Joint Exhibit 3, Article 22(a), p. 62. The term "parties" is defined in Schedule 1, "Definitions": "'Parties' means Builder and Purchaser." Joint Exhibit 3, p. iii. Specific procedures for change orders and conflicts between contract plans and specifications are addressed in Article 1(b) and Article 8(b). Article 1 further provides for specifications to prevail over contract plans, but the contract is to prevail over both contract plans and specifications. Article 8 provides that all change orders incorporated into the contract work shall be the subject of specific written agreement between the parties.

During construction of the Sohio vessels by Avondale, BP discovered certain structural defects in vessels in the BP fleet, specifically in its "BRITISH EXPLORER" class vessels. This discovery led BP to review the Sohio tankers' design and construction to evaluate possible similarities in the BP and Sohio vessels. BP's concern that the Sohio vessels might experience similar structural defects was also commu-

---

**3.** This warranty provides in pertinent part:

(a) *General*

Builder warrants that the vessel when sold and delivered to Purchaser [Sohio] shall conform to the Contract Plans and Specifications and to the undertakings otherwise contained in this Contract and shall be seaworthy, tight, staunch, strong and in every way ready to receive and transport cargo and suitable for use in the carriage of crude petroleum. In the event any defects in the design, original materials or workmanship in the vessel ... other than those defects which are due to wear and tear or misuse by or negligence of Purchaser or its employees or agents, are discovered within 12 months after delivery of the

Vessel to Purchaser or after [the date the vessel is deemed ready for delivery], any such defect (a "Warranty Deficiency") and any immediate damage to the Vessel resulting directly therefrom shall be corrected by Builder, provided that Purchaser shall have notified Builder of such defect within 30 days after discovery thereof....

Joint Exhibit 3, p. 38.

**4.** There is a separate Sohio-Avondale contract for each of the tankers in question. However, the language of each contract is identical, and by stipulation, the construction contract for Hull 2295 is designated the contract for all four vessels.

nicated to Avondale, both by telex[5] and during meetings in June 1976 involving Mike Harbottle of BP, Avondale Project Manager Al Mabson and Darold Poulin, an engineer heading Avondale's Hull Section.

At meetings on August 17–18, 1976, these problems were further discussed, along with two other subjects, propeller design and thermal stresses. See Stipulation No. 41. Attending these meetings were Mr. Poulin; M. Parker, an Avondale naval architect; Ian Telfer, chief naval architect at BP; John Clinton, a naval architect in BP's Special Projects Group, and Mr. Harbottle. See Joint Exhibit 8. Sohio did not participate directly in the meetings, although the Court finds it participated through BP as its designated contract representative.

The usual conference notes were prepared by BP's Mr. Harbottle and forwarded to Mr. Mabson. The notes reflect discussion of BP's concern with the Avondale representatives and state in pertinent part:

> ASI then presented their own findings which, in their opinion, indicated that similar fractures would not occur on their vessels being built in New Orleans. After further discussions, *it was agreed* that the Avondale ships would be modified as indicated in the attached sketches and notes.

See Joint Exhibit 8 (emphasis added). No change orders or other memorialization of agreement were executed in respect of matters discussed during the August 17–18 meetings. See Stipulation No. 44.

In 1977, Sohio assigned its rights under the contracts to a trust, with Avondale approval. The trustee, as designated ship-

owner, entered into separate bareboat charters for each of the vessels in question in this litigation. The chartering entities were four Shipco Companies, each named according to the tanker under charter. A long term time charter for each of the four vessels was simultaneously executed between each Shipco Company as chartered owner and SPC Shipping Inc. as time charterer. See Stipulation Nos. 18–20.

Sohio accepted delivery of the four vessels in question in 1977 and 1978. Thereafter, guaranty repair claims in respect of the vessels were submitted to Avondale pursuant to Article 9(a) of the contracts, and Avondale accepted responsibility for many of these claims. See Stipulation No. 47.

Sohio ultimately acknowledged expiration of warranty periods for each of the four vessels on the following dates:

ST ATIGUN PASS—December 11, 1978;

ST KEYSTONE CANYON—February 27, 1979;

ST BROOKS RANGE—May 12, 1979; and

ST THOMPSON PASS—September 8, 1979.

See Stipulation No. 49. Upon expiration of the above guaranty periods, various repair items remained unresolved, and by letter of November 20, 1979, Avondale sought resolution of the disputed warranty invoices and release of $1,225,536.48 from the contract hold back fund held by Sohio under Article 2 of the contracts to ensure completion by Avondale. See Joint Exhibit 9; Stipulation No. 52. By contrast, Sohio claimed it was entitled to retain the fund

---

**5.** The telex was from John Rutter, naval architect in charge of BP's Design and Construction Branch, to Avondale's Mr. Mabson. Contract communications, no matter what their content, were "channeled through" to Avondale through Mr. Mabson. See Harbottle Deposition, pp. 24–25. The telex provides in pertinent part:

> We have just experienced a major wave induced fatigue structural failure on a series of our [very large crude carriers] [emanating] from the end of butt welds to the edge of longitudinals having fillet welded face bars below the webb.... Your ship employs sim-

ilar long'ls and vert side frames. Lloyds confirm our experience that lap welded connections of F.B.'s and bkts to such frames have not resulted in failures. Your ship in the main employs lap welded [connections]. However, we must insist that where butt welds are currently shown, ... the detail will have to be changed. Pl study structure throughout ship and send revised details for approval wherever butt welding currently shown.... We emphasize this is major importance item.

See Plaintiffs' Exhibit 3.

and to recover an additional $40,000 from Avondale. Stipulation No. 53.[6]

Negotiations between Sohio and Avondale thereupon commenced, see Joint Exhibit 10, and continued through 1980 and 1981, between Richard Whiteside, Sohio's Manager of Marine Engineering, and Paul Wagner and Rene Meric, Avondale's Vice-President of Contract Administration. As confirmed through an exchange of telexes between Sohio and Avondale, an agreement was reached as to outstanding claims on December 9 and 10, 1981. See Joint Exhibits 15 and 16; Stipulation No. 56. The telexes further confirm "full and final settlement of all ASI [Avondale] obligations under the contract for Hulls 2295, 2296, 2297 and 2298" and "final settlement of the construction contracts."

On December 11, 1981, an alleged propeller casualty occurred on the ATIGUN PASS. In spring and summer 1982, structural fractures were discovered on all four vessels. In May 1982, Sohio's Mr. Whiteside reported the structural fractures to Avondale. Thereafter, under cover of a letter dated May 17, 1982, Mr. Meric sent Mr. Whiteside a copy of the minutes of the August 17–18, 1976 meetings. This was Sohio's first actual knowledge of those minutes. See Stipulation No. 45.[7]

Against these background stipulations, the Court heard testimony regarding the course of dealings between the parties and the particular matters discussed at the August 17–18, 1976 meetings. The Court also heard testimony of the circumstances surrounding the telex exchange of December 9–10, 1981, and the settlement of outstanding contract claims.

The Court first heard the testimony of Mr. Brunner, Avondale's Executive Vice-President of Contract Procedures. Mr. Brunner's testimony shows the parties understood and abided by the methods of contract modification through written contract amendment and change order procedures. Mr. Brunner testified, in connection with Defendant Exhibits 18–22 and 29,[8] that contract amendments were written and generally signed by the witness and a Sohio representative.[9] The exhibits further demonstrate this procedure and the level of Avondale's participating corporate representatives. See Joint Exhibits 31–36. The Court therefore finds general change order procedures called for the customer to request a change order, whereupon a price would be submitted and negotiated, and when agreed, the change order would be signed by Sohio and Avondale representatives.[10] In this regard, BP signed a number of change orders on behalf of Sohio,

---

**6.** The parties appear unable to agree as to the extent to which they disagreed. Thus, from Joint Exhibit 9, the Court has estimated the total fund then held by Sohio to approximate $3,130,-000; the parties were therefore about $4,400,000 apart in their claims.

**7.** Following the ATIGUN PASS casualty, an Avondale representative participated in a survey of the propeller damages at Sohio's request and did not bill Sohio for this trip. Mr. Meric also forwarded to Sohio suggested modifications for the vessels to ameliorate the failures reported in May 1982. Plaintiffs contend these actions by Avondale are tacit admissions of continuing warranty obligations surviving the December 9–10, 1981 settlement. However, the general context of the actions suggests Avondale was merely investigating the cause behind a potential claim. The Court would not characterize Avondale's actions as mere courtesies, but neither would Sohio's reports of the problems constitute mere courtesies. Practicality would dictate investigation into such complaints.

**8.** The Court overruled plaintiffs' objections to the relevancy of Defendant Exhibits 16–23. The exhibits demonstrate contract procedure and assist the Court in determining whether there was any contract change or warranty issuing from the August 17–18, 1976 meetings.

**9.** The amendment reflected in Exhibit 18 was signed by Avondale Chairman of the Board, Mr. Rice, and by Sohio Vice-President, Mr. Mosier, together with attesting witnesses. Defendant Exhibits 19–22 were signed by Mr. Brunner and by Sohio's Purchasing Manager, Mr. Cross.

**10.** The change order quotations were signed by Mr. Brunner in offer form, and a signed acknowledgment of such quotes or offers was oftentimes executed by Ian Telfer, BP's chief naval architect, with further written acceptance forwarded to Al Mabson at Avondale.

see Plaintiffs' Exhibit 1, and the Court finds that BP had authority to so represent Sohio in light of the BP-Sohio Supervisory Agreement and ongoing business procedures and dealings demonstrated by the exhibits and testimony in this case. But, on Avondale's part, the testimony and exhibits show consistent involvement of Avondale officers in the change order procedures. This distinction is important as the obligations here at issue are sought to be enforced against Avondale.

Mr. Brunner also testified to innumerable meetings between Avondale and BP to develop working drawings from the plans and specifications for daily construction of the vessels. The Court finds that such conferences were intended to iron out difficulties in construction, and if the contract was not specific, to discuss how a particular problem should be handled. Thus, conferences determined how to proceed to achieve previously specified work. If any changes in vessel design or construction were sought, a written change order would result. By contrast, any conference notes emanating from such meetings were in effect informal memoranda, not having any particular effect on the rights and obligations under the contracts, not in any particular form and not ordinarily intended to supplant the contract or any change orders.

Mr. Brunner's testimony and the documents in evidence show that contract formalities were not observed in every instance. See Joint Exhibits 26, 27 and 30. In particular, plaintiffs stress a prior modification of contract terms granting Sohio an extension of time in, inter alia, making certain payments, which contract modification was signed by neither Sohio nor BP. See Joint Exhibit 27. Thus, plaintiffs urge the Court to accept the August 1976 conference notes drafted by BP, Joint Exhibit 8, as a similar informal contract modification. The Court rejects this contention: The extension and other documents were signed by Avondale, against whom the contract modification would be enforced. The conference notes in question were not signed by an Avondale representative.

Thus, the Court concludes a failure to observe formalities on one particular occasion does not sanction a modification of warranties of the magnitude here at issue through the drafting of conference notes alone.

Plaintiffs further contend that Avondale's failure to object to the conference notes is an acceptance of the obligations ensuing from the purported superseding or modified warranties. However, the course of dealings between the parties does not reveal that the recipient of the notes, Mr. Mabson, could have bound Avondale to such obligations by his failure to object to a nonconforming writing. This is particularly true where the notes emanate from meetings attended by Avondale representatives, who, as Mr. Brunner testified, were not delegated any specific authority to alter contract terms during the meetings. To find such a tacit undertaking would stretch the clear mandate of the contracts beyond recognition.

Plaintiffs also stress BP's authority to elicit warranty representations from Avondale and negotiate on Sohio's behalf, in support of their assertion that a modified warranty was given. Assuming pro arguendo BP had such authority, BP's authority would not establish the authority of the Avondale representatives to bind Avondale to such an agreement. This absence of authority strongly militates against a finding that the August meetings resulted in an agreement, either oral or written, to modify existing warranties or undertake new obligations.

Moreover, it is a well accepted business principle that the extent of contractual warranties are figured in the contract cost. Provisions in a contract that it may not be changed, modified or amended except in writing, signed by the parties, are designed to obviate claims that the contract has been restructured without bargained for consideration. Plaintiffs' suggestion that Avondale would extend the limited warranties contained in the contract to encompass what plaintiffs claim in these proceedings defies imagination. There was no evidence

offered to show that the purported warranty modification occurring in August 1976 had any effect on the amounts to be paid to Avondale under the contract. The absence of such evidence confirms the lack of consideration for superseding the contract warranties.

The Court also heard the testimony of Rene Meric, Avondale's Group Vice-President of Contract Administration, tending to support the proposition that the conference notes in question do not rise to the status of a warranty extension, as typified by Defendant Exhibits 1–6.[11] The Court does not find Mr. Meric's brief testimony conclusive on the question whether the warranties were modified in the August 1976 meetings, but the Court does find the usual procedures for warranty extensions were not followed with regard to the purported warranty modification.

Avondale also offered the trial testimony of Mr. Poulin, head of Avondale's Hull Section. Mr. Poulin's testimony demonstrates Avondale's knowledge of potential structural problems derived from problems encountered on the BRITISH EXPLORER class vessels, to which Mr. Poulin referred as the Japanese vessels.[12] Mr. Poulin procured from BP drawings of the Japanese vessels and studied the drawings using ABS standards. However, Mr. Poulin opined there were three crucial differences between the Japanese vessels and the Sohio vessels. (1) The Sohio vessels had predominantly lap welded connections; (2) the Sohio vessels complied with ABS regulatory standards, whereas the Japanese vessels did not, and (3) the Sohio vessels were built of higher strength and grade steel.

Avondale also urged Mr. Poulin's testimony to show BP's reliance upon Lloyd's, rather than Avondale, for studies regarding possible cracking problems. The Court deems the content of the Lloyd's studies irrelevant, but accepted the testimony for the limited purpose of showing BP had input from Lloyd's regarding potential cracking problems on the Japanese vessels[13]. Thus, the Court permitted Mr. Poulin's testimony as to the calculations performed.

The deposition testimony of Michael Harbottle, Ian Telfer, and John Rutter was submitted by plaintiffs to contradict Mr. Poulin's testimony and to establish that Avondale made a specific oral warranty against the occurrence of stress fractures.[13a] Mr. Rutter testified to his conversations with Mr. Poulin, which satisfied Mr. Rutter that Avondale was aware of the structural failures sustained by the BRITISH EXPLORER class vessels, fully understood BP's concern and was conducting independent studies into the problem of structural failures due to stress. Rutter Deposition, pp. 40–42, 44–45, 79, 82–83. Mr. Telfer and Mr. Harbottle testified to events prior to and during the August 1976 meetings.

The record shows BP's confidence that Avondale was taking necessary precautions to avoid the problems experienced by BP's BRITISH EXPLORER class vessels. However, even if BP's confidence arose solely from Avondale's representations, the Court finds the assurances generating BP's confi-

11. The Court overruled plaintiffs' objections to the relevancy of Defendant Exhibits 1–6, because those exhibits demonstrate the manner in which warranties were extended under the contract.

12. More specifically, Poulin had heard of problems with butt welded connections on the Japanese vessels, and there were 214 butt welded connections on the Avondale vessels.

13. The evidence is conflicting whether Lloyd's studied only the Japanese vessels or whether Lloyd's studied both the Japanese and the Sohio vessels. For purposes of this Opinion, it is not material whether Lloyd's studied the Sohio vessels. It suffices for present purposes that Lloyd's studied the BP vessels, as this factor alone demonstrates the availability of technical knowledge to BP and thus Sohio from a reliable source independent of Avondale.

13a. The Court has painstakingly reviewed the depositions of the BP witnesses and has set forth in Appendix A to this opinion the pertinent portions of testimony, from which given the benefit of every favorable inference, plaintiffs might argue that a modified warranty arose.

dence did not constitute an agreement to modify then existing warranties, nor do they constitute a new agreement relating to the stress fractures alone.

The testimony convinces the Court that as a fully informed entity with bargaining power equal to Avondale's, BP dismissed as unnecessary formal contract negotiations and amendments and determined no specific warranty would be necessary. The evidence does not show an agreement to amend or modify the contract, but rather an agreement "to certain proposals [BP] put forward to grind the edges of flame-cut material in the problem areas prior to welding;" "to actually replace material in [certain areas of the vessels];" and which changes were represented by sketches attached to the minutes "to display simply the agreements that were reached during the discussions." See Harbottle Deposition pp. 57, 58 & 63.

First, BP's Mr. Harbottle admitted that the overall effect of the actions Avondale agreed to take as a result of BP's concern were "minimal."[14] See Harbottle Deposition p. 59, line 16. This confirms Mr. Poulin's testimony that discussion of the stress fracture problems occupied only two to three hours on the second day and two to three hours on the third day. Mr. Harbottle also admitted that he personally insured that Avondale effected measures to mitigate this problem. See Harbottle Deposition p. 65.[15] Moreover, BP assumed responsibility for the decision not to contact Sohio with regard to the potential structural failures, (see Harbottle Deposition p. 56), even though the problem was sufficient to move BP to bring in Lloyd's to conduct a study of the BP vessels. See *id.* at p. 45.[16] This testimony is at odds with deposition testimony of the BP representatives replete with BP's awareness of the "major importance" of the structural failure problem. See Plaintiffs' Exhibit 3; Harbottle Deposition p. 34. Nevertheless, given BP's admitted expertise [17] and resultant awareness of the problem, BP's agreed resolution to the problem with relatively minor technical alterations and the absence of Sohio's direct involvement are risks borne solely by BP. Moreover, BP's knowledge and actions are fully chargeable to Sohio, in light of BP's status as Sohio's contract representative. Similarly, BP's failure to obtain written assurances from Avondale and/or other written contract modification is fully chargeable to Sohio and thus to plaintiffs.

In a similar vein, BP's representatives showed an understanding of their role to insure that the tankers were suitable for their intended service.[18] See, e.g., Rutter Deposition p. 15. BP was by no means an unsophisticated concern unaware of the seriousness of the problems encountered in vessel construction and the expense of their consequences.

---

14. This testimony also supports a finding that any independent oral agreement resulting from the meetings lacked consideration.

15. The Court finds it unnecessary to determine whether the modifications were, in fact, made and whether Avondale's findings or representations were reasonable. The Court is here concerned only with facts tending to establish whether a specific warranty was made and whether there was a settlement of any remaining claims.

16. The Court would not be inclined to excuse Avondale from a breach of warranty, if there were one, solely because BP obtained technical advice from a source other than Avondale. However, it is abundantly clear BP had the technical expertise and resources to appreciate the severity of the problem and to communicate BP's concerns to Sohio.

17. The qualifications and experience of the BP representatives is amply demonstrated by their deposition testimony. See, e.g., Harbottle Deposition pp. 8–13; Rutter Deposition pp. 8–15; Telfer Deposition pp. 9–12.

18. Additional deposition testimony was submitted by plaintiffs for the purpose of showing certain stresses in the vessels exceeding the levels recommended by Lloyd's Register of Shipping. The relevance of such testimony is uncertain, in light of the stipulation that ABS was the classification society for the vessels in question. Moreover, any variance with Lloyd's recommendations is irrelevant to the extent it is submitted to show the vessels were not fit for their intended purposes. The issue before this Court is whether the contractual warranties were specifically modified, renewed or superseded as a result of the August meetings, not whether a breach of such warranties occurred.

BP was also well aware that the structural failures occurring on the BRITISH EXPLORER class vessels occurred five to six years after construction. See, e.g., Harbottle Deposition p. 28.[19] It is accordingly unfortunate that BP did not advise Sohio representatives conversant with the terms of the Sohio-Avondale contracts of potential problems arising after the expiration of the warranty period. However, as stated above, the Avondale witnesses establish to this Court's satisfaction that the parties had a working knowledge of the negotiation of warranty extensions and change orders and that BP most certainly had the sophistication to require a memorialization of Avondale's representations in compliance with formal contract procedure.

In sum, the meetings, conversations and conference notes upon which plaintiffs rely to support their claims were among non-executive employees, charged with the duty to assure that the vessels were constructed in accordance with specifications and who had authority to agree upon changes in drawings. As far as the Sohio interests were concerned, the individuals involved were technical consultants, not even direct employees of the contracting party, Sohio. Considering the totality of the circumstances surrounding the discussions and exchanges as a whole and not extracting them out of the context of the many conferences of this type, they were simply resolutions of particular problems in construction techniques, nothing more.

In addition to examining the evidence in light of plaintiffs' contention that Avondale modified the construction contract warranties, the Court is called upon to consider whether the Sopio-Avondale contract settlement of 1981 forecloses this litigation. On the settlement issue, the Court heard the testimony of Mr. Meric, who negotiated settlement of the guaranty matters on Avondale's behalf, and Richard Whiteside, Manager of Marine Engineering for Sohio and the Sohio Liaison Project Coordinator for the Construction of Vessels, who negotiated guaranty items on behalf of Sohio.

In light of Sohio's asserted lack of expertise in vessel construction, it is curious that Sohio did not obtain BP's input in negotiating close-out payments under the contracts. Nevertheless, plaintiffs contend that the negotiation and settlement of outstanding contract matters in 1981 could not have included future claims, and particularly potential claims for stress fractures, because of Sohio's lack of actual knowledge of matters transpiring in the August meetings and of the implications of the stress fracture problem.

As to these contentions, Mr. Meric testified with reference to Joints Exhibits 9, 10 and 12, demonstrating the innumerable items in dispute as between Avondale and Sohio, including warranty matters, a spare parts settlement, and liquidated damage claims for late delivery of the vessels. The Court also took notice of documents of unknown content approximately eighteen inches high demonstrating the quantum of correspondence exchanged in the course of settlement negotiations. The Court also found significant Mr. Meric's testimony of the parties' discussions that once the settlement agreements were signed, everything would be put to rest. Specifically, Mr. Meric testified there would be "no point otherwise;" his understanding was that whatever Avondale was obligated to do would be satisfied by the settlement agree-

---

**19.** Plaintiffs also submitted the testimony of James Cross, Purchasing Manager at Sohio, chief Sohio negotiator of the construction contracts and negotiator of the BP-Sohio Supervisory Agreement. Mr. Cross testified as to when BP was required to inform Sohio of agreed design modifications under the terms of the BP-Sohio agreements. However, as mentioned above, the Court finds BP's knowledge and actions chargeable to Sohio; whether BP acted properly in representing Sohio is not an issue before this Court. The Court also disregards Mr. Cross's testimony regarding the intent of the warranty provisions in the Sohio-Avondale contracts, sustaining Avondale's objections that the contract is the best evidence of its contents. In addition, Mr. Cross's testimony is replete with legal conclusions and matters of contract interpretation. The Court does not find the contract to be ambiguous, so as to permit the admission of parole evidence to explain its terms.

ment and that Mr. Whiteside understood this intent.

On cross-examination of Mr. Meric, plaintiffs attempted to show that no claims other than warranty, spare parts and liquidated damage claims were discussed. However, the Court draws no inference from the failure to discuss any other types of claims, including potential claims regarding stress fractures. First, the Court fully imputes to Sohio BP's knowledge regarding the stress fracture problem and its potential occurrence five to six years after operation of the vessels. Second, the occurrence of such stress fractures would be understood by such knowledgeable parties as BP, Avondale and Sohio to fall within the general category of a warranty item. That the particular Sohio representative negotiating close-out of warranty and other contract matters did not have actual knowledge of the stress fracture problem does not preclude a finding that Sohio had constructive knowledge of such claims, in light of the actual knowledge of its contract representative and technical advisor.

Mr. Whiteside testified on Sohio's behalf that he was the principal person involved in resolving the guaranty items and that his negotiating authority was limited to guaranty matters. However, Mr. Whiteside admitted he got management approval for the final figures and the confirming telex he sent, and again, the Court must conclude the settlement was intended to close out all contract matters. See Joint Exhibits 15 and 16. Mr. Whiteside further testified that there was no specific discussion of any future claims. Nevertheless, the parties have stipulated to Sohio's knowledge and acceptance of the time limitations imposed upon the warranties under the contract. Implicit in acceptance of warranty time limits is a recognition that possible future claims would be foreclosed.

The Court also admitted into evidence a memorandum from Mr. Whiteside dated August 6, 1982 recording "all damage or potential damage claims encountered during normal vessel operation," which memorandum was sent to Mr. A.E. Doller of Sohio's insurance department. See Defendant Exhibit 42. Although the cover memorandum was dated August 6, 1982, its attachments show dates for discovery of particular hull structural defects, including hull fractures, prior to December 1981. Accordingly, Sohio was presumed to know that there were outstanding structural defects at the time of the settlement agreement and presumed to have intended that the settlement agreement would cover such matters. Mr. Whiteside also admitted to industry recognition that all large tankers experience structural cracking in service. Thus, the Court is satisfied that the witness had actual knowledge of his own at the time he negotiated the warranty settlement agreements. Moreover, when asked if this is a maintenance item, the witness responded, "that's the only way you can repair it," which the Court accepts in the context of the question and response as an admission of the regular occurrence of such items.

The Court is mindful that certain structural fractures mentioned in the record, see Defendant Exhibit 42, predate the fractures that are the subject of this litigation and accordingly are not the fractures at issue in this suit. Nevertheless, the Court finds that as a general proposition, Sohio was chargeable with knowledge of the potential for occurrence of such problems and is charged with understanding, if indeed it did not actually understand, that the contract settlement foreclosed any further claims for structural defects.

The Court further finds the settlement was supported by consideration. At the time settlement negotiations commenced, the contract hold back fund amounted to $3,131,689.30. See Joint Exhibits 9–10. The Court finds that it was subsequently agreed Sohio would retain $2,394,346.02 of that amount after contract close out negotiations, leaving a difference of $737,343.28 owed Avondale. It was further agreed that Sohio would receive a spare parts adjustment credit of $21,700.23, see Joint Exhibit 15, such that Sohio would owe Avondale $715,643.02. See Stipulation No. 56.

In addition, the parties agreed to a settlement of Sohio's liquidated damage claims against Avondale, with Sohio retaining $697,500.00. See Joint Exhibit 15. Thus, Avondale relinquished claim to more than $3,000,000 in funds withheld by Sohio.

In conclusion, after listening attentively to the testimony of all parties involved in the confection of the settlement and taking into consideration the responses and demeanor of the witnesses on the stand, the Court is unequivocally of the opinion that it was the intent of the parties to fully compromise, settle and put to rest all claims resulting from the construction of the vessels, as confirmed by the exchange of telexes.[20]

### Conclusions of Law

This Court has subject matter jurisdiction by virtue of the parties' diverse citizenship. Plaintiffs have also alleged maritime tort actions within this Court's admiralty jurisdiction.

The Court has applied New York law to resolve the issues stemming from the alleged express warranty and the alleged settlement of all matters under the Sohio-Avondale contracts, in light of Article 22(e) of the Sohio-Avondale contracts, which states, "[T]he validity, enforcement and interpretation of the Contract shall be governed by the laws of the State of New York." However, the Court has applied maritime law to the question whether plaintiffs and intervenor have stated claims for maritime tort actions.

■ The Court concludes as a matter of law that plaintiffs and intevenor have not proved by a preponderance of the evidence that a warranty emanated from the August 1976 meetings, having considered the evidence of both oral representations and written statements. A warranty is a promise that a proposition of fact is true. See Black's Law Dictionary, p. 1757. It is "an

undertaking or stipulation, in writing or verbally, that a certain fact in relation to the subject of a contract is or shall be as it is stated or promised to be." *Id.* at p. 1758. Specifically, New York law defines an express warranty to include "[a]ny affirmation of fact or promise by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.Y.U.C.C. § 2–313(1)(a) (McKinney's 1964).

The Court finds no warranty was extended in this case. Construed in a light most favorable to the Sohio interests, the evidence shows discussion of a perceived technical problem, similar to innumerable other discussions, wherein the parties worked together to come to a mutually satisfactory resolution of a problem. The Court finds no promise that stress fractures would not occur, but rather an exchange of ideas and proposed solutions as between two knowledgeable entities, to resolve a perceived difficulty in the best workable manner. The Court is convinced that the statements constituted at most expressions of opinion by Avondale representatives and discussions with BP representatives of sufficient technical knowledge to exercise their own independent judgment as to what action should be required of Avondale. *See Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d 34 (7th Cir.1980) (construing Indiana Law). Accordingly, the Court also declines to hold that the representations induced BP's continued satisfaction with Avondale, and thus became part of the bargain, in light of BP's exercise of independent judgment.

■ Nevertheless, even if this Court determined, which it does not, that the Avondale representatives warranted against the occurrence of stress fractures, such warranty could not be enforced by the Court due to the parties' failure to satisfy the

---

**20.** The voluminous depositions submitted by the parties obscure the real issues. The testimony of the witnesses covered tangential matters unrelated to the focal points of the bifurcated trial and Avondale's motion for summary judgment.

Avoiding a ruling at this stage in the proceedings would only permit further obfuscation. Sometimes, a trial judge has to bite the bullet. Accordingly, the Court holds the parties intended to put the construction contracts to rest.

contracts' writing requirements.[21] Such writing requirements are valid under New York law. *See* N.Y.U.C.C. § 2–209(3); N.Y. General Obligations Law § 15–301(1). *See also California Union Ins. Co. v. Bechtel Corp.*, 473 So.2d 861 (La.App. 4th Cir.), *writ denied*, 477 So.2d 1128 (La.1985).

There was no waiver of the writing requirement. Such a waiver may be found where circumstances show an unequivocal agreement to waive a writing requirement or reliance by one party upon an oral modification. *See Elmsford Sheet Metal Workers, Inc., v. Shasta Indus., Inc.*, 103 A.D.2d 764, 477 N.Y.S.2d 391 (N.Y.Sup.1984); *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265, *reargument denied*, 57 N.Y.2d 674, 454 N.Y.S.2d 1032, 439 N.E.2d 1247 (1982). However, there is conspicuously absent from this case an indisputable mutual departure from the writing requirements of the contract so as to permit a finding of enforceable oral warranty. Moreover, as mentioned briefly above, the evidence fails to demonstrate BP's reliance upon Avondale's oral statements, assuming those statements were in fact warranties, so as to estop Avondale's enforcement of the writing requirement. The testimony of the witnesses and the exhibits clearly show BP's experience, BP's active participation in dealing with the stress fracture problem and BP's knowing acceptance of technical arguments and opinions furthered by Avondale. The absence of reliance is further demonstrated by BP's having forced certain technical construction modifications, to which modifications Avondale agreed. If anything, Avondale's acceptance of the technical modifications insisted by BP emphasizes BP's refusal to rely

blindly upon empty assurances, and as stated above, militates against a finding that any warranty was made in the first place.

Viewed realistically, the arguments of the Sohio interests are an attempt to alter the warranty set forth in the construction contracts and the limitations applicable to those warranties. However, the evidence is absolutely devoid of indication that events transpiring at the August 1976 meetings resulted in a new and separate contract based upon mutual promises with adequate consideration. *See Bakhshandeh v. Am. Cyanamid Co.*, 8 A.D.2d 35, 185 N.Y.S.2d 635, 638 (N.Y.Sup.1959), *aff'd*, 8 N.Y.2d 981, 204 N.Y.S.2d 881, 169 N.E.2d 188 (N.Y.1960). Moreover, even if BP understood a warranty modification to have resulted from the August meetings or a new contract pertaining to the stress fractures alone to have resulted, Avondale reasonably perceived there to be no agreement to alter the underlying contracts and warranties contained therein. Accordingly, notwithstanding BP's intent, there is no enforceable contract. *See Gupta v. University of Rochester*, 57 A.D.2d 731, 395 N.Y.S.2d 566 (N.Y.Sup.1977).

The Court also finds persuasive the authority cited by Avondale for the proposition that any warranties emanating from the August meetings would be so vague as to be unenforceable. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 436 N.E.2d 247, 417 N.E.2d 541 (1981). It would defy rationality to find a general warranty, without limitation in scope or time, that no stress fractures would occur on the Sohio vessels, particularly in light of the absence of consideration.[22]

---

**21.** The Court finds distinguishable the cases cited by plaintiffs for the proposition that the writing requirement would be satisfied by the August 1976 conference notes. For example, the minutes of a defendant's meeting authorizing a sale by the defendant corporation have been held to satisfy the statute of frauds. *See Church of God of Prospect Plaza v. Fourth Church of Christ*, 76 A.D.2d 712, 431 N.Y.S.2d 834, 837 (N.Y.Sup.1980), *aff'd*, 54 N.Y.2d 742, 442 N.Y.S.2d 986, 426 N.E.2d 480 (1981). However, the minutes were generated by the party

against whom their enforcement was sought. Moreover, the circumstances surrounding the transaction showed no intent to reserve the effectiveness of the agreement to sell until a formal contract was signed. There is no similar lack of intent to comply with the construction contracts' writing requirements discernible from the evidence in this case.

**22.** Similarly, the Court rejects the contention that the original one-year warranty limitation in the Sohio-Avondale contracts is inapplicable to

■ The Sohio interests encounter another hurdle in the form of the December 1981 settlement of the construction contracts and the Court holds the settlement bars plaintiffs' causes of action. Under New York law, an accord and satisfaction exists where there is an agreement between two parties whereby one party agrees to give or perform and the other party agrees to accept the stipulated performance in discharge of an unresolved obligation or an outstanding claim. *See, e.g., Stahl Management Corp. v. Conceptions Unlimited,* 554 F.Supp. 890 (S.D.N.Y.1983); *Pepper's Steel & Alloys, Inc. v. Lissner Minerals & Metals, Inc.,* 494 F.Supp. 487 (S.D.N.Y.1979). The presence of outstanding claims are readily discernible from the record: Sohio was holding funds exceeding $3,000,000; Avondale computed that $1,000,000 of that amount should be paid to it, whereas Sohio contended it should be entitled to retain the entire $3,000,000 and receive an additional $40,000.

The disputes between the parties and the ultimate settlement encompassed warranty matters and liquidated damages for delays in deliveries, and the Court has absolutely no hesitation in holding that the potential for the occurrence of stress fractures five to six years after service created an outstanding claim actually known and perceived as such by BP and at least constructively known to Sohio. The Court's conclusion that all claims have been settled ensues regardless of whether the modified warranties may have existed or whether new, separate and independent warranties are asserted. The Court further holds that the settlement encompassed past, present

and future claims whether known or unknown, notwithstanding Sohio's contention that it did not contemplate such a settlement. The exchange of telexes between the parties clearly demonstrates settlement of "any and all" claims under the contract. Moreover, this was a settlement agreement negotiated by commerical parties with substantially equal bargaining power and there is no policy furthered by vitiating the settlement. *See Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295 (5th Cir. 1983).[23]

Having thus disposed of any claims for alleged breach of warranty, the Court turns to whether there survived any claims for maritime tort liability for negligent design and construction of the vessels or for strict liability.

In determining whether plaintiffs and intervenor have a maritime tort claim for negligent design and construction, the Court is bound by *Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.,* 519 F.2d 171, *reh. denied* 522 F.2d 1280 (5th Cir.1975) (Court affirming jury verdict that vessel sinking resulted from defect in design or construction and that defendant was negligent in the design or manufacture of the vessel). *Jig III* bars this Court from holding that the construction contract warranties subsumed the tort of negligent design and manufacture. Rather, the Court may only consider whether the ship building contract itself prescribes a specific and exclusive remedy in event of damage to the vessels in question.

■ The Court holds the contractual warranty limitation set forth in the Sohio-Avondale contracts sufficiently broad to

any alleged subsequent contractual modifications. As Sohio admits, the parties were well aware that any structural cracks might not appear until the vessels had been in service for at least six years. Thus, the Court disagrees that the warranty limitation is "manifestly unreasonable" because it is sought to be applied to a latent defect not discoverable within the contractual time limitation on the warranty. The problem was fully known to and anticipated by BP. *See also* N.Y.U.C.C. § 2–316(2); *Zicari v. Joseph Harris Co.,* 33 A.D.2d 17, 304 N.Y.S.2d

918 (N.Y.Sup.1969), *appeal denied,* 26 N.Y.2d 610, 309 N.Y.S.2d 1027, 258 N.E.2d 103 (1970).

**23.** The Court in *Ingram* gave effect to settlement stating that it did not matter whether the parties may not have known of or considered all possible claims. The instant case is an even stronger one for enforcement of the settlement, where such potential claims were known. The parties' sophistication and knowledge is another pivotal factor in giving effect to settlement. *See* 698 F.2d at 1322.

exclude any maritime tort remedies. The Avondale contracts specifically prescribe that the warranties set forth in the contracts are exclusive of any other *remedy*, whereas the contract limitations in *Jig III* addressed solely whether there remained any warranties other than as set forth in the contract. Thus, the Sohio-Avondale contract precludes the Sohio interests' claim for negligent manufacture and design. This holding is consistent with the concerns expressed in *Jig III* that limitations of liability in the commercial context are enforced as between parties of relatively equal bargaining power who can be held to have considered the relative costs of insuring against negligent design and manufacture and have incorporated this concern into the contract. The Sohio and Avondale interests are clearly parties with the commercial and technical expertise to have considered such ramifications, and the participation and advices of BP during precontract negotiations enforces this conclusion.

■ The Court interprets *Jig III* as limited to waiver of claims for negligent design and manufacture, and accordingly finds no controlling authority in the Fifth Circuit addressing the viability of the claims against Avondale for strict liability. Accordingly, the Court finds persuasive *East River SS Corp. v. Delaval Turbine, Inc.,* 752 F.2d 903 (3d Cir.), *cert. granted,* —— U.S. ——, 106 S.Ct. 56, 88 L.Ed.2d 45 (1985), wherein the Court held, applying general maritime law, that strict liability claims in cases of property damage require consideration of the risks inherent in the asserted product defects and examination of circumstances surrounding the losses before the manufacturer may be held liable in strict liability for property damage. Thus, damage to a defective product is not actionable in tort under strict liability unless the design defect creates an unreasonable risk of harm to persons or property

other than the product itself. 752 F.2d at 908, *citing Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965).[24]

Under the guidance of *Delaval,* the Court has determined that plaintiffs neither allege nor have shown a sudden or calamitous event triggering the manifestation of a defect and resulting damage, such as might be present in an explosion or fire. As in *Delaval,* the defects in question involved gradual deterioration rather than imposing a risk of sudden or calamitous injury to persons and property. Thus, the type of risks at issue here concern only the charterers' expectations as to the commercial suitability of the product rather than implicating a manufacturer's obligation to place safe products in the stream of commerce. *See* 752 F.2d at 909. For these reasons, the Court holds no maritime tort claim for strict liability exists under the circumstances of these cases.

Notwithstanding the above conclusions that no maritime tort causes of action for negligence or strict liability here exist, the Court further holds that any such causes of action are presently barred by the contract settlement. The Court finds the negotiation of the contract close out settlement and the exchange of significant consideration for this settlement to constitute a pivotal departure from the facts under consideration in *Jig III.* Thus, *Jig III* would not require litigation of the maritime tort claims here at issue, even if the warranty limitations were insufficient to preclude the claims. *See General Intermodal Logistics Corp. v. Mainstream Shipyards & Supply, Inc.,* 666 F.2d 129, 133 (5th Cir.1982) (*Jig III* not applicable to release of claims under ship repair contract; court acknowledging "cogent dissent" in *Jig III*).

■ The Court further concludes that the claims of SPC Shipping as time charterer are barred by the holdings of *Robins*

---

24. The *Seely* decision has been embraced by the New York courts. *See Cayuga Harvester v. Allis-Chalmers Corp.,* 95 A.D.2d 5, 465 N.Y.S.2d 606, 620–21 (N.Y.Sup.1983). *See also Butler v. Pittway Corp.,* 770 F.2d 7 (2d Cir.1985). However,

the Court finds the outcome of the strict liability and negligent design and manufacture issues governed by general maritime law, with state law merely persuasive.

*Drydock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), as recently reaffirmed in *State of Louisiana ex rel. Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir.1985). The Court distinguishes the position of SPC Shipping as time charterer from that of the Shipco companies who stand as bareboat charterers with a certain proprietary interest absent in the case of SPC Shipping.[25]

There remain the legal contentions of AEG Telefunken raised in its motion for judgment on the pleadings. The Court concludes the motion of AEG is well founded, due to plaintiffs' concession that they do not have a cause of action remaining for breach of warranty under the contracts, see note 1 supra; the effect of the contract settlement; and the holdings of *Jig III, Delaval* and *Robins Drydock.*

■ First, the Court holds that the release of Avondale under the contract settlements, without a reservation of rights as against AEG, effected a release of AEG. *See* La.Civ.Code of 1870 art. 2203. *See also Guarisco v. Penn. Cas. Co.,* 209 La. 435, 24 So.2d 678, 679 (1945); *Miami Parts & Spring, Inc. v. Champion Spark Plug Co.,* 402 F.2d 83 (5th Cir.1968).[26] Moreover, to the extent that plaintiffs assert a cause of action in warranty against AEG, pretermitting the absence of privity between plaintiffs and intervenor SPC Shipping on the one hand and AEG on the other, the Court concludes the contract settlements terminate all warranty claims in connection with the Sohio vessels.

Likewise, the Court concludes that the contracts would not in any event afford greater warranty rights against AEG than would be available against Avondale.

Thus, the Court reiterates its cognizance of plaintiffs' admission they have no remaining warranty rights under the Sohio-Avondale contracts and its prior holdings as to the impact of the warranty limitations, which are deemed applicable to the claims against AEG.

The Court also holds that the presence of a maritime tort action against AEG is governed by the same standards applicable to Avondale and accordingly applies to the claims against AEG the holdings above under *Jig III* and *Delaval.* Similarly, the *Robins Drydock* rationale precludes the claims of SPC Shipping against AEG.[27]

The consolidated cases are accordingly dismissed with prejudice, with plaintiffs and intervenor to bear all costs, the Court having determined there was no modification of the construction contract warranties; that all claims arising out of the vessel construction were settled as a result of the Sohio-Avondale negotiations in 1981, that plaintiffs have no maritime tort causes of action against Avondale and AEG Telefunken as a matter of law; and that the claims of plaintiff SPC Shipping as time charterer are barred by *Robins Drydock* and its progeny.

The Clerk of Court is hereby ordered to enter judgment accordingly.

## APPENDIX

The Rutter, Telfer and Harbottle depositions constitute plaintiffs' best evidentiary offerings regarding the possible expression of a warranty. However, the testimony of those witnesses falls short of establishing that a warranty was given.

**25.** In view of the Court's holdings on the warranty issues, the Court finds it unnecessary to address Avondale's arguments that the absence of privity between Avondale on the one hand and the Shipco Companies and SPC Shipping on the other bars plaintiffs' recovery for breach of warranty.

**26.** Plaintiffs have not demonstrated to the Court's satisfaction that New York law would govern the liability of AEG herein, inasmuch as AEG is not a party to the Avondale-Sohio contracts containing the choice of New York law

provision. Nor is the Court satisfied that a different result would obtain under New York law.

**27.** As indicated above, the Court has chosen not to address the effect of the absence of privity between plaintiffs and Avondale, in light of the plethora of other grounds for dismissal of plaintiffs' and intervenor's claims. Similarly, the Court refrains from addressing the privity arguments as to AEG.

The specific testimony of *Mr. Rutter*, which construed in its best light, might tend to establish a warranty, is as follows:

Q. ... Do you recall whether ... any representative of Avondale did contact you in London after [Mr. Harbottle discussed the BRITISH INVENTOR problems with Avondale]?

A. Well, I recall, ... discussing with Mr. Poulin the problem that we had found on BRITISH INVENTOR, and why we were concerned with their ship, in particular and what we thought had caused the problem at that time, and asking them to verify and check, do the necessary calculations, to insure that such an occurrence would not happen on their ships in the life, the intended life of the ship. ... The intended life of the ship was 20 years.

Q. What was your understanding from discussions with Mr. Poulin as to the actions Avondale was going to undertake?

A. Well, I understood that he was going to model the connections on the Avondale ships ....

. . . .

Mr. Poulin told me that he didn't think that they had a problem because although the longitudinals were similar type, they had improvements in their design which certainly reduced the possibility of failures of this type occurring.

(Rutter Deposition pp. 40–42). Further testimony was:

I recall telephone conversations during which Avondale had taken a strong stance that they were now satisfied that the problems that we had experienced on the BRITISH INVENTOR would not occur during the life of their tankers, and they were giving reasons for that.... They also *felt* that the brackets on their ships were superior because they had radiused [sic] endings. They *felt* that the connections were superior because

the cut-outs on the brackets and flat bars were of better shape, and generally they *didn't believe* that they had a problem. (Rutter Deposition pp. 44–45) (emphasis added).

Mr. Rutter also testified generally to the occurrence of "telephone conversations with Avondale," (Rutter Deposition p. 79, lines 6–7), regarding the results of BP's comparison of Avondale tankers with other tankers in the BP fleet, which took place between June 1976 to early December 1976, with a final conversation in early December of 1976 with Mr. Poulin. In regard to BP's empirical work, Mr. Rutter testified as follows:

Mr. Poulin was very confident that this work that we had done (A) was empirical and that ... it was based on ships with mild steel employed in the relevant details, and that the Avondale ship employed higher tensile steel and therefore the allowable stresses would be different to what we were talking about. In other words, that there was not a problem on their ships despite this work that we had done. He also reiterated the other factors which I have mentioned before and which I would like to emphasize I had spoken to him about on a number of occasions, so while I was not at the meeting similar conclusions had already been mentioned to me on the phone ... by Mr. Poulin.

(Rutter Deposition pp. 82–83).

The specific testimony of *Mr. Harbottle*, which construed in its best light, might tend to establish a warranty is as follows:

[Q. When asked about the positions of Mr. Mabson and Mr. Poulin at an initial meeting between the witness and those Avondale representatives in June of 1976]:

A. They started out, Darold Poulin started out by expressing confidence in their structure; they *felt* that they had done sufficient study and work on their structure to be very confident that the problem didn't exist. He even suggested with the few details we did have at that time that had we built out

■■■■■ ships under his guidance, we wouldn't be having problems on our ships.

... [I]n, the end, I seem to recall Al Mabson really arbitrated between the two of us and suggested to Darold that even if Avondale were very confident, because the client was concerned, *perhaps* they should do a bit of work to alleviate the client's fears. ... [T]he meeting ended with that proposal being put forward, and Avondale going away to think about it....

(Harbottle Deposition p. 37) (emphasis added).

Mr. Harbottle recalled two further conversations with Mr. Poulin in June:

[First], they had thought about the problem over the weekend and they were going to do some investigation of their record and further calculations on their structure down to the point where the particular detail that had caused us a problem on our vessels was involved; and suggested they were going to do a further finite element analysis, make up a computer model for the detail, and run that through the computer, again under the belief that they didn't need to do it; they didn't require [sic] to do it but as the client was concerned, they would carry out such an exercise to alleviate our fears.

[Secondly], they indicated that they did not intend stopping fitting these brackets while the investigation was going on.

(Harbottle Deposition pp. 40–41).

And as to the August 1976 meeting, Mr. Harbottle testified that Mr.. Poulin was quite clearly the Avondale spokesman, (Harbottle Deposition p. 48), and that:

[Poulin] indicated that, again from the outset, that he didn't feel that any actions had been required but because the client was concerned, they had looked at their overall structure again throughout the ship; they had specifically reviewed the areas where we felt there was problems on their vessel [sic] and they had also done preliminary review ... of the BP vessel in the problem areas.

(Harbottle Deposition pp. 48–49). Further testimony:

Q. What was Avondale's position at the meeting as presented by Mr. Poulin?

A. Darold didn't really change throughout. He was very confident and expressed his feeling that there was no, absolutely no problem with the Avondale ship, and he used the comparisons in his little summary to even imply that again had we built our own ship at his guidance, we wouldn't have a problem on our ship.

(Harbottle Deposition pp. 50–51).

Mr. Harbottle's testimony of the factors distinguishing the Sohio vessels from the BP vessels, as pointed out by Mr. Poulin, matches that of Mr. Poulin. (Harbottle Deposition p. 51). Mr. Harbottle further stated that Mr. Poulin's position with regard to the utilization of high tensile strength steel

formed one of the basic parts of his argument really. Because Avondale were using high tensile steel, the structure could absorb slightly higher stresses than would be acceptable with mild steel. In other words, I guess he was saying the allowable stress levels were increased with the use of high tensile steel.

(Harbottle Deposition p. 52). Further testimony was as follows:

Q. [W]hat representations, if any, were given by Mr. Poulin to BP at the meeting of August 17–18, 1976?

A. Again, they expressed total confidence in their structure and cited these examples that I have said and I seem to recall a computer printout as part of their presentation, but because of all of that, because of the factors in those documents, they re-expressed their confidence in the structure.

(Harbottle Deposition pp. 54–55). Significantly, Mr. Harbottle further stated:

[W]e became convinced during that presentation that Avondale had, in fact, done sufficient work to convince themselves and to confirm their viewpoint that, in fact, there were no structural problems related to over stressing in

their ships, and we ended up accepting their argument, presentation, and we decided really we did not need to have recall to Sohio.

(Harbottle Deposition p. 56).

Subsequently, Mr. Harbottle was involved in the agreed upon actions by "simply insuring that they were carried out physically on the ship through the use of our own inspectors . . . ." (Harbottle Deposition p. 65).

The deposition testimony of *Ian Telfer*, which construed in its best light, might support a warranty, is as follows:

Q. What was decided as to the course of action to take?

A. The course of action was as described in these minutes here of date 25 August.

(Telfer Deposition p. 135). When asked specifically as to matters discussed in the meeting, Mr. Telfer testified:

[Darold Poulin] said that they had carried out further analyses and in great detail and they were satisfied with what they had gotten. I also remember them pulling our legs by saying that they could have told us that the BRITISH EXPLORER would fracture.

(Telfer Deposition p. 138, lines 16–23).

The discussion then went on, alright, you are assuring, you, Avondale, are assuring us that you have fully calculated this, that you have taken into account what we have said to you about the EXPLORER and you are saying that you are quite satisfied with the structure. But, your calculations didn't include anything to do with flame cut edges and workmanship and we must ask you to grind these edges because in our opinion we have not fully exonerated the flame cut edge in this instance nor did we ever. So they agreed at that date to grind the face of the longitudinals where things were being butted to them and in the cargo tank area.

(Telfer Deposition p. 139, line 13 to p. 140, line 7).

With regard to what was agreed upon in the meeting, Mr. Telfer testified that modification of the vessels was agreed upon, (Telfer Deposition p. 168), and that the group felt that this method of construction alleviated the construction problems that existed on the BRITISH EXPLORER. (Telfer Deposition p. 169).

None of the foregoing testimony establishes either an agreement to alter the contract terms or a new specific promise by Avondale, supported by consideration, to the effect that stress fractures would not occur.