473 So.2d 861 (1985)
CALIFORNIA UNION INSURANCE COMPANY, Allianz Underwriters, Inc., Columbia Casualty Insurance Company, Federal Insurance Company, First State Insurance Company, Harbor Insurance Company, Home Insurance Company, Integrity Insurance Company, Mutual Fire Marine & Inland Insurance Company, Northbrook Insurance Company, and Gulf States Utilities Company
v.
BECHTEL CORPORATION and Westinghouse Electric Corporation.
No. CA 2841.
Court of Appeal of Louisiana, Fourth Circuit.
June 26, 1985.
Rehearing Denied August 27, 1985.
*862 Robert A. Vosbein, Edward D. Markle, Deborah B. Rouen, Adams and Reese, New Orleans, for plaintiffs-appellants.
John V. Baus, Madeleine Fischer, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendants-appellees.
Before REDMANN, C.J., and SCHOTT and BARRY, JJ.
SCHOTT, Judge.
This is a suit by Gulf States Utilities Company (GSU) and its subrogated insurers for damage resulting from an explosion in a transformer at a power station operated by GSU. The named defendants were Bechtel Corporation which contracted with GSU to build the station and Westinghouse Electric Corporation which furnished the transformer. Bechtel was voluntarily dismissed from the case after the first day of trial. At the conclusion of plaintiff's case, Westinghouse filed a motion for involuntary dismissal of the case in accordance with LSA-C.C.P. Art. 1672 B., and the trial court granted the motion. From this judgment plaintiff has appealed raising numerous specifications of error regarding sufficiency of the evidence, expert opinion testimony, and evidentiary rulings. From these alleged errors plaintiff argues that it had made out a prima facie case against Westinghouse so that the judge wrongfully dismissed its case. However, we do not reach these factual issues because we have concluded that Westinghouse is insulated from liability because of contractual limitations agreed to by plaintiff when the contract with Westinghouse was confected.
On January 6, 1972 Bechtel acting as plaintiff's agent submitted a Bid Request to Westinghouse for Normal and Reserve Station Service Transformers at a power station being constructed at St. Gabriel, Louisiana. The Bid Request specified that the following warranty would be provided by the supplier:
"8. WARRANTIES  GUARANTEES:
Seller warrants that the goods shall be free from defects in design, material, workmanship, and title, and shall conform in all respects to the terms of this purchase order, and shall be of the best quality, if no quality is specified. If it appears within one year from the date of placing the equipment into service for the purpose for which it was purchased that the equipment, or any part thereof, does not conform to these warranties, and Buyer so notifies Seller within a reasonable time after its discovery, Seller shall thereupon promptly correct such noncomformity at its sole expense. The conditions of any subsequent tests shall be mutually agreed upon and Seller shall be notified of and may be represented at all tests that may be made. Except as otherwise provided in this purchase order, Seller's liability hereunder shall extend to all damages proximately caused by the breach of any of the foregoing warranties or guarantees, but such liability shall in no event include loss of profit *863 or loss of use. NO IMPLIED WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR PURPOSE SHALL APPLY."
In addition, Bechtel's specifications contained under 2.20 the following under "Warranty":
"Seller agrees that the Warranties Guarantees Provisions of Bechtel Corporation General Conditions, Paragraph 8, shall apply hereto. The statement "within one year from the date of placing the equipment into service for the purpose for which it was purchased".... means "one year following commercial operation of Willow Glen Station  Unit 5" except that if Seller's standard warranty provisions exceed this period, then said standard warranty shall apply."
On February 7 Westinghouse submitted its proposal under a covering letter which specifically notified Bechtel that its quote was in accordance with warranty provisions found on page PE-1 of its proposal in lieu of the above quoted warranty provision requested by Bechtel. This page PE-1 was as follows:
"GENERAL CONDITIONS:
The General Conditions appearing on the reverse of Page 1 of this Purchase Order and any modifications thereto appearing herein shall govern, except that Clause 8, Warranties  Guarantees, is hereby deleted and the following shall apply in lieu thereof:
WARRANTY
The Seller warrants to the Buyer that the equipment to be delivered hereunder will be free from defects in material or workmanship and will be of the kind and quality designated or specified in this Purchase Order.
This warranty shall apply only to defects appearing within 18 months from the date of shipment by the Seller, or one year from the date the equipment is placed in service, whichever occurs first. If the Seller installs the equipment or supplies technical direction of installation by contract, the warranty period shall run from the completion of installation, provided same is not unreasonably delayed by the Buyer. The conditions of any test shall be mutually agreed upon and the Seller shall be notified of, and may be represented at, all tests that may be made.
If the equipment delivered hereunder does not meet the above warranty, and if the Buyer promptly notifies the Seller, the Seller shall thereupon correct any defect, including non-conformance with the Specifications, either (at its option) by repairing any defective or damaged parts of the equipment, or by making available at the Seller's plant, necessary repaired or replacement parts. The liability of the Seller under this warranty (except as to title), or for any loss or damage to the equipment whether the claim is based on contract or negligence, shall not exceed the cost of correcting defects in the equipment as herein provided, and upon the expiration of the warranty period, all such liability shall terminate. The foregoing shall constitute the exclusive remedy of the Buyer and the exclusive liability of the Seller.
LIMITATION OF LIABILITY
The following Clause shall apply in addition to the General Conditions appearing on the reverse of Page 1:
The Seller's liability on any claim of any kind, including negligence, for any loss or damage arising out of, connected with, or resulting from this Purchase Order, or from the performance or breach thereof, or from the design, manufacture, sale, delivery, resale, or repair or use of any equipment covered by or furnished under this Purchase Order shall in no case exceed the price allowable to the equipment or part thereof which gives rise to the claim, except as provided for in the Clause of the General Conditions entitled "Infringement" (Clause 9). In no event shall the Seller be liable for special or consequential damages."
Included in Westinghouse's proposal along with the special PE-1 was a printed copy of Westinghouse's "Selling Policy 48-000" dated July 15, 1971 with regards to *864 transformers and certain other equipment sold by Westinghouse. This Selling Policy 48-000 provided the following "Standard Warranty" on such equipment.
"Westinghouse warrants that the equipment delivered by it will be of the kind and quality described in the order or contract and will be free of defects in workmanship and material. Should a failure to conform to this warranty appear within one year after date of shipment, Westinghouse shall, upon prompt notification thereof and substantiation that the equipment has been stored, installed, operated and maintained in accordance with Westinghouse recommendations and standard industry practice, correct such non-conformities, at its option, either by repairing any defective part or parts or by supplying a repaired or replacement part or parts f.o.b. Westinghouse repair plant or factory. However, if Westinghouse has installed the equipment or furnished field engineering services with respect to its installation, and provided such installation has not been delayed by the purchaser, said one year shall run from completion of the installation. In no event shall Westinghouse be responsible for providing working access to the defect, including disassembly and reassembly of the equipment.
* * * * * *

This warranty is in lieu of all warranties of merchantability, fitness for purpose, or other warranties, express or implied, except of title and against patent infringement. Correction of non-conformities in the manner and for the period of time provided above, shall constitute fulfillment of all liabilities of Westinghouse to the purchaser, whether based on contract, negligence or otherwise with respect to or arising out of such equipment. (Underscored portion was in italics.)"
The Selling Policy went on to provide for an "Extended Warranty" as follows:
"The Westinghouse standard warranty covers a period of twelve months from date of shipment. When purchaser's specification calls for a longer period, this warranty may be extended up to two additional years at a price addition of 1% for the second year and 2% for the third year. It is Westinghouse policy not to extend the warranty beyond 36 months."
Finally the Selling Policy contained the following "Limitation of Liability":
"Neither party shall be liable for special, indirect, incidental or consequential damages. The remedies of the purchaser, as set forth herein, are exclusive, and the liability of Westinghouse with respect to any contract or sale or anything done in connection therewith, whether in contract, in tort, under any warranty, or otherwise, shall not, except as expressly provided herein, exceed the price of the equipment or part on which such liability is based."
On February 24 Bechtel advised Westinghouse that in the course of evaluating the proposal a number of questions had been developed including the following:
"8. Please affirm the Bechtel warranty described in paragraph 2.20 is included in the quoted price and is not subject to the adder mentioned in paragraph "Extended Warranty", page 3 of Selling Policy 48-000."
On March 9, 1972 Westinghouse responded as follows:
"8. We are quoting in strict accordance with the warranty provisions of Bechtel General Condition Sheet PE-1 which states the equipment is warranted for one year from date of operation or 18 months from date of shipment, whichever occurs first."
On March 10 Westinghouse offered an "extended warranty" as follows:
"The normal station service transformer and the reserve station service transformer will be warranted from date of shipment through one year of commercial operation or until September 1, 1976, whichever occurs first. This is based on promised delivery dates in the proposal. The price addition for this extended warranty will be $4,571.00."
*865 Finally on May 9 Westinghouse wrote to Bechtel confirming a telephone conversation that Westinghouse accepted Bechtel's order for the normal service transformer only for the total price of $94,497 which included $1,750 for extended warranty as defined in the March 10 letter.
On May 30 Bechtel issued its formal written purchase order to Westinghouse for the transformer which again contained under "General Conditions" its warranty clause quoted above as "8. Warranties  Guarantees". On June 28, Westinghouse formally and in writing accepted the purchase order but under terms and conditions which included the following:
"Warranty
Unless a different warranty was stated or referred to in the Westinghouse quotation, in which event such warranty shall be exclusive, Westinghouse warrants that the products sold hereunder shall be of the kind and quality described in the quotation and shall be free of defects in workmanship or materials, and Westinghouse shall, in complete fulfillment of its liabilities under this warranty and if given prompt notice by the Purchaser, correct, by repair or replacement, f.o.b. its factory, any nonconformity which shall appear under proper and normal use of the products within one year after the date of shipment. THIS WARRANTY, OR ANY OTHER WARRANTY STATED OR REFERRED TO IN THE WESTINGHOUSE QUOTATION, IS EXCLUSIVE AND IS IN LIEU OF ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHER WARRANTY OF QUALITY, WHETHER EXPRESS OR IMPLIED."
On August 4 a revised purchase order was issued Westinghouse by Bechtel identical to the above referred to May 30 purchase order as far as warranty is concerned and this was formally accepted by Westinghouse on November 16 with the same last quoted warranty provision.
The transformer was shipped by Westinghouse on June 17, 1974 and was placed into commercial operation on December 19, 1975. The explosion occurred on July 10, 1979. Under Westinghouse's PE-1, General Conditions, its warranty applied only to defects appearing within 18 months from June 17, 1974 or one year from December 19, 1975 whichever occurs first. Westinghouse contends that this precludes recovery for plaintiff.
Before trial Westinghouse had moved for summary judgment on the basis of its warranty limitations, but GSU convinced the court that at trial it could show that Westinghouse's warranty provisions were "confusing" and unclear and, thus, not binding on GSU. The first witness called by GSU was Donald Charles Robinette, the buyer for Bechtel who handled the transformer negotiations with Westinghouse. GSU attempted to elicit from this witness testimony that he found the warranty provisions confusing. Westinghouse's timely objections to this testimony were sustained by the trial judge because he found the provisions clear regardless of Robinette's perception of them.
In this court GSU contends the court erred in disallowing the proffered testimony. C.C. Art. 1945 (as written prior to passage of Act 331 of 1984) provided that the intent of the parties to a contract is to be determined by the words of the contract when these are clear and explicit and lead to no absurd consequences. We find the words of the warranty to be clear so that Robinette's testimony as to what he thought they meant was irrelevant and properly excluded.
The trial court in reasons for judgment emphatically concluded that the warranty was clear and unambiguous. He stated that he had overruled Westinghouse's motion for summary judgment on GSU's representation that evidence of confusion would be forthcoming but that no such admissible evidence was produced. We agree with this conclusion. The documents are clear and need no interpretation, clarification, or supplementation. In a word they speak for themselves.
*866 After all negotiations between these parties had been completed the initial purchase order and revised purchase order were submitted to Westinghouse. It accepted Bechtel's (GSU's) offer with a clear reference to the warranty contained in its original proposal on PE-1. It would not be liable for defects appearing 18 months after delivery or one year after start-up. Furthermore, the documentation concerning the extended warranty created no substantial confusion or lack of clarity. This simply extended the warranty from date of shipment through one year of operation or until September 1, 1976 whichever occurred first. Under the warranty contained in PE-1 it would extend for 18 months from May 6, 1974 or one year from start-up, whichever occurred first. Start-up did not occur until December 1975 so that the original warranty would have expired on November 6, 1975. There is no support for the argument that the casualty of July 10, 1979 was covered by the warranty.
Finally, GSU contends that Westinghouse, in a letter of June 17, 1974, modified the contract between the parties to the extent that Westinghouse completely abrogated all warranty limitations included therein. The facts leading up to the June 17 letter were that the contract provided for various "hold points" while the transformer was being constructed at each of which Westinghouse was to notify Bechtel that a point in the construction had been reached and Bechtel was to inspect the work before Westinghouse resumed construction. One of these points was at the completion of the core and coil assembly but before the tank was built around them thereby closing them in. Westinghouse failed to notify Bechtel of this hold point and the inspection was not made. Construction proceeded and the core and coil could not be inspected. As a result one E.C. Hoyt, a Westinghouse Design Engineer, on June 17, 1974 wrote Bechtel as follows:
"Customer's coil and core inspection of the above unit was an official hold point, previously established for this order.
"However the shop did not notify Order Service Department when this unit was ready for customer's inspection.
"Core and coil inspection was given to this unit by Westinghouse Quality Control and inspection proved satisfactory. Thus, Westinghouse will assume all responsibility on the core and coil assembly."
The evidence does not indicate exactly what Westinghouse intended by this letter. Perhaps by stating that it would now assume "all responsibility" Westinghouse would go beyond mere replacement and pay consequential damages in the event the core and coil assembly proved to be defective. Perhaps the intention was to provide, without the additional charge for which it had been offered, a full thirty-six month extended warranty from the time the transformer was shipped (which would have been an extension to June, 1977). But we cannot construe this letter to be a total abrogation of the warranty limitations which had been bargained for at such length. GSU would have us interpret this letter by adding words such as "for an indefinite period of time"; in effect to guarantee the transformer forever. Such a result is not only improbable but incongruous. At this point it would have been more reasonable for Westinghouse to dismantle the tank than to assume absolute unlimited liability. Rather, we believe the clear intent was for Westinghouse to acknowledge that Bechtel had not voluntarily waived the inspection which paragraph 2.16 of the specifications provided for. Westinghouse was obliged under the contract to warrant its workmanship whether the inspection was made or not. When Bechtel accepted the transformer with full knowledge that it had not made the inspection it was reserving its right on the strength of Westinghouse's assurance that it would be responsible for the core and coil assembly within the contractual warranty period and at whatever risk might be involved in its failure to have Bechtel make its inspection.
The contract under consideration was a commercial undertaking between two highly *867 sophisticated parties. While courts are reluctant to enforce warranty limitations on consumers they recognize that parties such as Bechtel (acting for GSU) and Westinghouse are free to bargain as they see fit and are bound by their contracts. See Lazy Bug Shops, Inc. v. American District Telegraph Co., 374 So.2d 183 (La.App. 4th Cir.1979), writ denied 376 So.2d 1271 (La.); FMC Corporation v. Continental Grain Co., 355 So.2d 953 (La.App. 4th Cir. 1977), writ denied 356 So.2d 1001 (La.). We have concluded that these parties freely limited Westinghouse's warranty so that it was not liable for a defect if any in the transformer appearing in July 1979.
The judgment appealed from is affirmed.
AFFIRMED.