673 So.2d 668 (1996)
FINA OIL AND CHEMICAL CO.
v.
AMOCO PRODUCTION CO., et al.
No. 95 CA 1877.
Court of Appeal of Louisiana, First Circuit.
May 10, 1996.
*670 David C. Treen, Charles K. Reasonover, Francis J. Barry, New Orleans, for PlaintiffAppellantFina Oil and Chemical Co.
John M. McCollam, Philip N. Asprodites, Scott A. O'Connor, New Orleans, for DefendantsAppelleesAmoco Production Company, MW Petroleum Corporation and Apache Corporation.
William F. Bailey, Lafayette, for DefendantsAppelleesAmoco Production Company, MW Petroleum Corporation and Apache Corporation.
Before LOTTINGER, C.J., and GONZALES and FITZSIMMONS, JJ.
FITZSIMMONS, Judge.
Amoco Production Company (Amoco) operated, and owned a 50% interest in, three oil and gas fields in Louisiana. Operation of the three oil and gas fields was governed by Joint Operating Agreements (JOAs). Amoco transferred its lease interests in the three fields; Charenton, Lake Boeuf, and Lake Boudreaux, to a subsidiary corporation, MW Petroleum Corporation (MW). Subsequently, Apache Corporation (Apache) bought all of the stock of MW.
Fina Oil and Chemical Company (Fina), a non-operator/50% interest holder in the three fields, protested the transfer of the lease interests by Amoco without notice to Fina. Plaintiff, Fina, sued defendants, Amoco, MW, and Apache. Fina claimed that the transfer triggered the preferential rights option to purchase and the operator selection clauses of the JOAs. Amoco, MW, and Apache asserted that the transfer to MW was exempt under the JOAs, and the sale of stock of a corporation was outside the scope of the JOAs.
Fina and the defendants filed motions for summary judgment. All parties agreed that no genuine issues of material fact remained. The issue was whether, as a matter of law, the sale of stock of MW, the holder of the lease interests, triggered the preferential rights or operator selection clauses. The trial court found that the sale of 100% of MW stock to Apache did not trigger the preferential rights or operator selection clauses. The trial court granted defendants' motion for *671 summary judgment, and denied Fina's. Fina moved for a new trial. The motion was denied. Fina appealed. We affirm.
MW was formally incorporated on October 2, 1990. Initially, Amoco transferred between 500 million and 1 billion dollars worth of properties to MW. This was done as part of a corporate restructuring plan. MW was marketed world wide. Because of the dollars involved, no serious offers for MW were made. The package of properties was later downsized to make the MW package more affordable. The plan was worked out after consultation with the investment banking firm of Morgan Stanley & Co. The goal was to streamline Amoco by divestment of certain non-core assets to a subsidiary. A secondary consideration was to avoid employee downsizing by offering employment opportunities with MW to Amoco employees. One possibility considered early on was a traditional reorganization: the shares of the subsidiary would be distributed to Amoco's shareholders. Another possibility was sale of the new subsidiary.
The selection criteria for fields to be divested included high operating costs, isolated fields, and poor financial returns. Fields burdened with preferential rights or operator clauses was not a selection criteria in any of the documents in the record.
The selected assets were transferred to the new subsidiary corporation, MW, with a management team in place. The new corporation was initially marketed to foreign investors. At the time of the sale of MW to Apache, the MW properties numbered in the hundreds and were found in eleven different states. The MW properties included the lease interests in the three Louisiana fields. After the transfer by Amoco to MW, MW became the holder-owner of the Louisiana lease interests and succeeded to the rights and obligations of the JOA provisions.
Subsequently, MW became the recognized operator of the lease interests. On June 30, 1991, Apache purchased all of the stock of MW for approximately 545 million dollars. As of the date of the trial, MW still owned the lease interests.

JOINT OPERATING AGREEMENTS
The JOAs contain a preferential right and option to purchase for party A that is triggered by a bona fide offer to party B for B's lease interest, which party B is willing to accept. The applicable preferential rights clauses in all three JOAs are fundamentally the same. In the most restrictive agreement, the preferential right does not apply to transfers by a corporate party in connection with a merger, consolidation, or reorganization between a parent, subsidiary or affiliated company.
The only operator selection clause subject to the motion for summary judgment was the one in the Charenton Field JOA. The pertinent part of that clause provided:
Should Operator ... sell or otherwise dispose of more than 50% of its interest in the lease acreage ... (except to an affiliated, subsidiary, or successor corporation, which shall not be regarded as a disposition of interest), it shall thereupon cease to be Operator hereunder and Non-Operator, if it then owns as much as 50% interest, shall become Operator.
Thus, under the JOAs, a transfer or sale of the lease interests could trigger the JOA provisions in question, unless the transfer was exempt. One of the recognized exemptions was a transfer to a subsidiary. Under the narrowest preferential rights clauses, the transfer had to be in connection with a reorganization, merger, or consolidation.
Amoco asserts that the transfer to MW was part of a reorganization. Reorganization "is a general term describing corporate amalgamations or readjustments. The classification of the Internal Revenue Code is widely used in general corporate literature" as examples of reorganizations. Hamilton, The Law of Corporations 350 (Nutshell Series) (1980 West). Reorganizations include statutory merger or consolidation, exchange of voting shares, a spin off of assets from one corporation to a new corporation, a sell off of a subsidiary, recapitalization, or a change of identity or place of organization. Id.; Henn & Alexander, Law of Corporations § 351 (3d ed. 1983).

*672 TRANSFER TO MW
Even under the most restrictive provision in the preferential rights clauses or the Charenton operator clause, transfers of the lease interests made to subsidiary corporations in connection with a reorganization are exempt. No one disputes that the transfer to MW was exempt. In fact, Fina admitted in oral argument on the motions for summary judgment that Amoco's transfer of interests to MW did not trigger the JOA.
On appeal, as on the motion for summary judgment, Fina does not rely on an argument that material facts were still at issue. It is the trial court's interpretation of the JOAs and the ultimate conclusions to be drawn from the facts that Fina believes are wrong. Fina asserts that, based on the essential facts, the preferential rights and operator clauses were triggered. Fina puts forth two possible bases: either the sale of MW was prohibited and not exempt under the JOAs, or, MW was not operated as a separate corporation, and the sale was actually a prohibited sale of assets.

SALE OF MW
To decide this case, we must answer three questions. Was the sale of the corporate stock of MW prohibited by the JOA? Was the sale of stock a triggering event that resulted in a transfer of the burdened lease interests? Should the corporate entity be disregarded, and the sale be treated as an asset sale?
A corporation is a separate entity from its shareholders. La.C.C. art. 24; Jones v. Briley, 593 So.2d 391, 394 (La.App. 1st Cir.1991). The sale of corporate shares is not a sale of assets. The shareholders' interest in the corporation does not equate to ownership by the shareholder of specific corporation assets. La.R.S. 12: 41B(4); Courtney Corporation v. Demarest, 379 So.2d 812, 812 (La.App. 4th Cir.), writ denied, 382 So.2d 166 (La.1980).
Most preferential right provisions are drafted so as to be triggered by a `sale.' Because of the broad range of interpretations that can be derived from that term, the determination of which transfers will trigger the preferential right is difficult. In making this determination, courts have generally placed emphasis on either the presence or absence of arm's length dealing between the owner of the burdened interest and the third party transferee or upon the effect of the conveyance as placing the property beyond the reach of the holder of the right.
... [A]n absence of arm's length dealing in transactions between commercially related parties is ... generally held to preclude the application of preferential right provisions. Thus, courts have ruled that a triggering sale has not occurred when a burdened property is transferred to the owner's wholly owned corporation.... Following the same reasoning, a federal court [, in Gamble v. Cornell Oil Co., 154 F.Supp. 581, 588 n. 19 (W.D.Ok. 1957), affirmed, 260 F.2d 860 (10th Cir. 1958)] held that where a corporation owned the burdened interest, the sale of all the corporation's stock did not constitute a sale that would invoke a preferential right provision.
Harlan Abright, Preferential Right Provisions and their Applicability to Oil and Gas Instruments, 32 Sw.L.J. 803, 811 (1978) (footnotes omitted).
Fina admits that the sale of some or all of the corporate stock of Amoco, while Amoco owned the lease interests, would not have triggered the preferential rights and operator selection clauses. In fact, authority cited by Fina specifically states that sale of all of the stock of the holder of lease interests would not trigger preferential rights. The sale of the stock is not a sale of the burdened lease interests. See Harry M. Reasoner, Preferential Purchase Rights in Oil and Gas Instruments, 46 Tex.L.Rev. 57, 72 (1967); Jeffrey J. Scott, Restrictions on Alienation Applied to Oil and Gas Transactions, 31 Rocky Mtn.Min.L.Inst., 15-1, 15-27 (Section 15.06) (1985). The question then becomes why should the sale of MW stock, while MW held the lease interests, engender a different result?
Amoco, the parent corporation, sold all of the shares of MW stock to Apache. The JOA does not prohibit the sale of stock. *673 To read the JOA's prohibition against sale of the lease interests as a prohibition against the sale of shareholders' interest would overturn the well-established law of corporations and be an egregious error of law. To read the absence of a prohibition of stock sales as a prohibition of all stock sales is absurd in this case. That position contradicts Fina's admission that the sale of the corporate stock of Amoco would not have triggered the JOA provisions. Secondly, if "parties made no provision for a particular situation, it must be assumed that they intended to bind themselves... to ... the law...." La.C.C. art. 2054. Under the corporate law of Louisiana, sale of corporate shares does not result in a transfer of the corporate property. La.R.S. 12: 41B(4); Courtney Corporation, 379 So.2d at 812. Without a sale or transfer of the lease interests by MW, the provisions of the preferential rights clauses were not triggered.
Having found that the JOAs did not prohibit the sale of stock, and that the sale of corporate stock does not equate to a transfer of the lease interests, our review continues by asking the next question raised by Fina. Should the court look beyond recognized corporate law to determine if a prohibited sale took place and prevent an injustice? In other words, did the sale of stock impermissibly place the burdened lease interests beyond the reach of Fina, the holder of right? Was the spirit of the agreement violated? See Harlan Abright, supra, 32 Sw.L.J. at 811-13. The answer is no. Fina does not dispute that MW, as transferee of the lease interests from Amoco, must abide by the provisions of the JOAs. Fina has the same rights in relation to MW, as it did with Amoco.
Thus, we find that the sale of stock was not prohibited by the JOAs. In the absence of a sale or transfer of the lease interests, the provisions at issue were not triggered. That resolution leaves only the question of whether the corporate identity should be disregarded, and the sale treated as a sale of assets.

SHOULD THE CORPORATE ENTITY BE DISREGARDED?
Corporations are recognized juridical persons. La.C.C. art. 24. The role of the corporate identity is perceived as beneficial to business and industry. Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1167 (La.1991). Only exceptional circumstances warrant disregarding the concept of a corporation as a separate entity. Riggins, 590 So.2d at 1168; Jones, 593 So.2d at 394. This action is known as "piercing the corporate veil." The court may pierce the "corporate veil" under two exceptional circumstances. First, where the shareholders, acting through the corporation, commit fraud or deceit on a third party, the court will look to the shareholders for justice. Secondly, the court may disregard the corporate identity where shareholders fail to conduct the business on a corporate footing. Such a failure can occur if the shareholder disregarded the corporate formalities to such an extent that the shareholder and the corporation became indistinguishable, or such unity existed that separate individualities ceased and the corporation was operated as the "alter ego" of the shareholder. See Riggins, 590 So.2d at 1168; WKG-TV Video Electronic College, Inc. v. Reynolds, 618 So.2d 1023, 1026 (La.App. 1st Cir.1993); Jones, 593 So.2d at 394.
The determination of whether to allow piercing of the corporate veil is made by considering the totality of the circumstances. Riggins, 590 So.2d at 1169; Jones, 593 So.2d at 394. Some of the circumstances that may point to a disregard of corporate identity are: (1) commingling of corporate and shareholder funds, (2) failure to follow statutory formalities for incorporating and transacting corporate activities, (3) under-capitalization, (4) failure to provide separate bank accounts and bookkeeping records, and (5) failure to hold regular shareholder and director meetings. Riggins, 590 So.2d at 1168; Jones, 593 So.2d at 395. The involvement in the corporate business of the sole or majority shareholder is insufficient alone to establish a basis for disregard of the corporate entity. Riggins, 590 So.2d at 1168; See Chin v. Roussel, 456 So.2d 673, 678 (La.App. 5th Cir.), writ denied, 459 So.2d 540 (La. 1984).
The initial burden is on the shareholders to show the existence of a corporation. *674 Once that burden is met, the burden shifts to the challenger or third party to show the exceptional circumstances that must exist to warrant disregard of the corporation's separate identity. Jones, 593 So.2d at 394. In the absence of shareholder fraud, the plaintiffs bear a heavy burden of proof. Riggins, 590 So.2d at 1168. The circumstances must be so strong as to clearly indicate that corporation and shareholder operated as one. Lopez v. TDI Services, Inc., 93-619 (La.App. 3d Cir. 2/2/94); 631 So.2d 679, 686, writ denied, 94-0864 (La. 6/3/94); 637 So.2d 501; Calm Electric Appliance Company, Inc. v. Harper, 430 So.2d 143, 145 (La.App. 2d Cir.1983).
Although Fina does not specifically argue the existence of genuine issues of material fact, it does argue that MW's corporate existence should be disregarded. Whether Amoco and MW were operated as one is a factual matter for the trier of fact. Thus, we must determine if a genuine issue of material fact remained that would preclude summary judgment, before we can finally conclude that the summary judgment was correct.
If the defendants met their burden on summary judgment to show that no genuine issues of material fact existed and that, as a matter of law, they are entitled to summary judgment, the burden shifted to Fina. To preclude summary judgment, Fina must controvert the facts established by defendants. Conclusory allegations and denial of the pleadings are insufficient to meet Fina's burden. La.C.C.P. art. 967.
The facts in the record do not support the conclusory allegation, asserted by Fina, that MW was merely the alter ego of Amoco or a finding that Amoco ignored the corporate formalities. Neither can we find any proof in the record for Fina's conclusion that MW was created to circumvent Fina's rights under the JOAs.
The record contains overwhelming evidence that Amoco had a legitimate business purpose as its goal in the creation of MW. The affidavits and depositions of Amoco executives and Amoco's investment banking consultants from Morgan Stanley & Co. attest that the goal was one of reorganization of Amoco, not circumvention of preferential rights. The transfer process chosen by Amoco, including the sale of MW to Apache, is not an unusual business procedure. Amoco wanted to reorganize or restructure itself and maximize the economic benefits of some of its assets through a spin off of a subsidiary corporation. MW was created before Apache was on the scene. Amoco actively marketed MW. It did not market the specific lease interests. (It is Fina who is solely interested in the three fields, and wants to purchase only those fields.) Apache never submitted an offer for the lease interests, but negotiated with Amoco for the purchase of the stock of MW.
The three fields (in which Fina held interests in conjunction with Amoco) were but a small fraction of the properties transferred to MW by Amoco. Amoco, MW, and Apache reviewed the JOAs before the sale of MW. After the review, they concluded that the sale of corporate stock was not covered or governed by the JOAs and the sale of MW would not trigger the clauses in question.[1] Fina argues that the agreements between Amoco and Apache outlining who would cover what if a company did sue on the preferential rights issue supports the conclusion that Amoco was trying to circumvent those rights. A review of these plans does nothing more than show that the parties provided for indemnity or hold harmless types of coverage in the event that someone disagreed with the legal position of Amoco, MW, and Apache. The plans also included provisions for environmental damages or suits and traditional liability or litigation risks.
MW was organized under the laws of Delaware and had the necessary corporate documents. The record contains a management agreement between Amoco and MW which *675 obligated Amoco to provide management services, management personnel, and pay bills, salaries, and expenses. In return, MW would reimburse Amoco for operating expenses and pay a fee of 40 million dollars a year. It appears that MW opened its own bank account just prior to the sale of stock to Apache. Under its own terms, the management services contract terminated upon the sale of the subsidiary. The president of MW testified that the eight senior management executives that transferred to MW were dedicated to running MW and did so. Apache did not retain the services of the major executives of MW after the sale. Such action is not an unheard of occurrence after the sale of a corporation.
Although it appears that the shareholder, the parent corporation Amoco, was involved in the running of MW via the management contract, selection of the corporate officers, and selection of the properties to be transferred to MW, we do not find these facts determinative of a lack of corporate footing. See Chin v. Roussel, 456 So.2d 673 (La.App. 5th Cir.), writ denied, 459 So.2d 540 (La.1984). Shareholders are not prohibited from contracting with corporations and are involved in corporate decisions as shareholders and elected directors or officers. See, e.g., La.R.S. 12:76, 81, & 82. Piercing of the corporate veil is not triggered by simple evidence that a shareholder is involved in the corporation. Clear, strong evidence is needed to prove that the shareholder has not maintained the separate identity of the corporation. See Riggins, 590 So.2d at 1168.
After the defendants supported their motion for summary judgment through affidavits, depositions, and documentary evidence, the burden shifted to Fina to bring forth more than mere allegations of deceit or lack of corporate footing and show that a genuine issue of material fact existed. See La.C.C.P. art. 967. Fina failed to controvert facts established by the defendants. The evidence in the record pointed to by Fina was insufficient to preclude summary judgment.
We find no basis for holding Amoco to a higher standard than we would any sole or majority shareholder. Further, we find no basis exists for lowering Fina's burden of proof. The record before us simply does not support Fina's allegation that Amoco ignored the corporate identity of MW or that Amoco and MW became indistinguishable or operated as one. The record contains no evidence that the management contract was a fiction, that the executives appointed by the shareholder to run MW did not do so or breached their duty to MW, or that MW was undercapitalized. It is true that MW opened a separate bank account in May, a few months before the sale to Apache. However, in the absence of any information regarding how the bank accounts were handled under the management agreement, the opening of an MW account some seven months after incorporation is insufficient evidence of commingling of corporate and shareholder funds or MW's failure to provide separate bank accounts and bookkeeping records.
Fina and Amoco are sophisticated business concerns that certainly understood the definition of the term "reorganization." Reorganizations can be accomplished by spin offs of subsidiaries. If Fina did not want to agree to the clauses that exempted transfers to subsidiaries in connection with reorganization or wanted sales of stock of wholly owned subsidiaries included as a trigger mechanism, Fina should not have become a party in interest in the three fields subject to the JOAs.
Fina had first hand knowledge of how the specific clauses related to a change of party. Fina itself had become a party in the three oil and gas fields in essentially the same manner as Apache. Fina asserts that its acquisition was exempt: its predecessor, Tenneco Oil Company, sold substantially all of its assets, another exempted type of transfer.
Tenneco created several subsidiaries to receive its oil and gas properties and sold the stock of one to Fina. It is unclear from the record whether Tenneco's sale of all of its oil and gas properties was a sale of all or substantially all of its corporate assets. See Harlan Abright, supra, 32 Sw.L.J. at 813 (discussion of what constitutes a sale of assets). In an unrelated suit arising from the *676 Tenneco-Fina deal, Fina argued that its purchase of stock of a Tenneco subsidiary was not a conveyance of the subsidiary's property.

CONCLUSION
The trial court found no genuine issue of material fact existed. Amoco was entitled to judgment as a matter of law. We agree. The transfer of the lease interests to MW was admittedly a valid transfer. The sale of MW stock was not a sale or transfer of the lease interests. MW still holds the lease interests. Thus, no transfer of the lease interests occurred. Without a transfer of the lease interests, the provisions of the various JOAs are not triggered. How or whether MW can validly transfer the lease interests under the JOAs is not the question before this court.
For these reasons, we affirm the grant of summary judgment by the trial court in favor of the defendants and the denial of the motion for summary judgment by Fina. The costs of the appeal are assessed to Fina.
AFFIRMED.
GONZALES, J., concurs.
NOTES
[1] Fina points to Exhibit 54 as proof that defendants knew that a sale of stock was not an exempted transfer, and proceeded in spite of that knowledge in circumvention of Fina's rights. However, the exhibit does not support that conclusion. Exhibit 54 includes a due diligence review sheet. One of the questions for the reviewer is: DOES PREF RIGHT PROVISION EXEMPT: TRANSFERS OF STOCK OWNERSHIP YES__ NO__. The NO space is checked. However, immediately adjacent is the hand written notation"not addressed."