**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 24 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CITGO PETROLEUM
CORPORATION,

      Plaintiff - Appellant,

v.

OCCIDENTAL CHEMICAL
CORPORATION,

      Defendant - Appellee.

No. 01-5022
(D.C. No. 99-CV-32-H)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **MCWILLIAMS**, and **LUCERO**, Circuit Judges.

---

      Plaintiff-Appellant CITGO Petroleum Corporation (CITGO) appeals from

the district court's grant of summary judgment to Defendant-Appellee Occidental

Chemical Corporation (OxyChem) and denial of CITGO's cross-motion for

summary judgment.  In this diversity case, we have jurisdiction under 28 U.S.C §

1291 and we affirm.

---

      [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Background

In 1983, Cities Service Company ("Cities") sold its CITGO stock to The Southland Corporation ("Southland"). As part of the consideration to Southland, Cities, along with Cities Service Oil and Gas Corporation ("CSOG"), executed a Petrochemical Plant Site Right of First Refusal Agreement ("ROFR") pursuant to which CITGO would have a preferential right to purchase certain petrochemical plant properties in the event Cities received an offer to purchase them from another party. Under the terms of the ROFR, the preemptive right is not triggered by a lease of five years or less, or by a transfer to an entity in which OPC retains at least a 50 percent interest. One of the properties subject to the ROFR is a facility in Lake Charles, Louisiana ("Lake Charles Facility), which is the property at issue in this case. OxyChem, a subsidiary of Occidental Petroleum Corporation ("OPC") and successor in interest to CSOG, eventually assumed all the rights and obligations that Cities and CSOG had under the ROFR. This case involves OPC's attempt to transfer the property without triggering CITGO's right of first refusal to purchase it.

On March 19, 1998, OPC proposed a Master Transaction Agreement ("March MTA") with Equistar Chemicals, L.P. ("Equistar") and other business entities (collectively, with Equistar, "the Partnership"). Under this proposed arrangement, three subsidiaries of OPC would join Equistar and receive a 29.5%

ownership interest in the partnership. In addition to the partnership interest, the OPC subsidiaries were also to receive a $420 million cash payment and the Partnership would assume $205 million of the OPC subsidiaries' debt. In exchange, the OPC subsidiaries would either contribute or cause to be contributed certain petrochemical manufacturing facilities to the Partnership, including the Lake Charles Facility. Both parties concede that had the March MTA gone into effect, the transfer of the Lake Charles Facility to Equistar would have triggered CITGO's right of first refusal.

But the March MTA never went into effect. After discovering the existence of the ROFR, which had initially been overlooked, and after OxyChem failed to obtain a waiver of its provisions from CITGO, the parties entered into a new Master Transaction Agreement ("May MTA"). The May MTA involved a number of steps to achieve its goal. First, OxyChem would contribute or cause to be contributed certain assets (essentially the same assets as in the March MTA, only excluding the Lake Charles Facility) to Occidental Petrochem Partner 1 (OPP 1), a wholly-owned subsidiary of OxyChem. 2 Aplt. App. at 407. Upon effecting a five-year lease of the Lake Charles Facility (with OxyChem as lessor and OPP 1 as lessee), OPP 1 would assign its interest in that lease to Equistar. Id. In addition, OxyChem agreed to guarantee $419,700,000 of Equistar's debt. Id. In exchange for the contribution of assets, the lease interest, and the debt guarantee,

the OCP subsidiaries would receive, similar to the March MTA, a 29.5% interest in Equistar, a $419,700,000 cash payment, and the assumption of $205,000,000 of indebtedness by Equistar.  Id. at 407, 461.

The second step of this transaction was set to occur upon the end of the five-year lease term.  At that time, the Equistar partnership units held by the OCP subsidiaries would be reduced by approximately 4%.  Id. at 510.  Equistar and OPP 1 would form a partnership called the Lake Charles Partnership ("LC Partnership") with OPP 1 having an equity interest of 50.1% and Equistar having an interest of 49.9%.  Id.  OPP 1 would then cause the Lake Charles Facility to be contributed to the LC Partnership.  Id.  The LC Partnership would then enter into an operating agreement with Equistar under which Equistar would, with certain exceptions, have the right and obligation to make all day-to-day decisions of the LC Partnership.  Id. at 510–11.  One of these exceptions applies to the disposition of assets having a fair market value exceeding $30,000,000, which would include the Lake Charles Facility.  Id. at 477.  Any decision related to such a disposition requires the mutual agreement of both OPP 1 and Equistar.  Id. at 510.  Thus, in form at least, OPP 1, a wholly-owned affiliate of OxyChem, would continue to own a 50.1% interest in the Lake Charles Facility by virtue of its interest in the LC Partnership.  CITGO, convinced that this corporate maneuvering represents a failed effort to evade its rights under the ROFR, brought this suit against

OxyChem, charging breach of contract and tortious breach of the covenant of good faith and fair dealing. The district court dismissed the tortious breach claim pursuant to Fed. R. Civ. P. 12(b)(6); CITGO has not appealed that order which leaves remaining only the breach of contract claim. We thus proceed to the district court's disposition of the cross motions for summary judgment.

## Discussion

We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court. L&M Enter., Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1287 (10th Cir. 2000) (citation omitted). Summary judgment is appropriate if "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a summary judgment motion, the court views the record "in the light most favorable to the nonmoving party." Thournir v. Meyer, 909 F.2d 408, 409 (10th Cir. 1990) (citation omitted).

OxyChem claims that because CITGO failed to comply with the Northern District of Oklahoma's Local Rule 56.1, the undisputed material facts it listed in its summary judgment motion must be taken as such.[1] CITGO however, does not

---

[1]The Rule requires the response brief to a motion for summary judgment to contain a concise statement of material facts as to which the party contends a genuine issue exists, that each fact in dispute be numbered, that the brief make

appear to take issue with OxyChem's eleven undisputed facts specified in that motion. Instead, CITGO merely claims that the district court should have taken additional facts into consideration, but is rather hazy on specifying just which facts those are. See Aplt. Repl. Br. at 27. Although compliance with local rules is important, the district court made no mention of any such non-compliance and this case will be evaluated under normal summary judgment principles. See Hernandez v. George, 793 F.2d 264, 266 (10th Cir. 1986) (stating that district courts have discretion in applying local rules).

The ROFR provides, and the parties agree, that Louisiana law controls the substantive issues in this case. See Aplt. App. at 127 (ROFR clause stating that Louisiana law controls). The Louisiana Civil Code states that "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Id. art. 2046. Thus, once a court determines that the terms of a written contract are susceptible to only one reasonable interpretation, no parol evidence should be admitted to ascertain the parties' intent. See McCarroll v. McCarroll, 701 So.2d 1280, 1286 (La. 1997) (citing Dixie Campers, Inc. v.

---

particularized record references, and, "if applicable, shall state the number of the movant's fact that is disputed." N.D. Okla. L. Civ. R. 56.1(B).

- 6 -

Vesely Co., 398 So.2d 1087 (La. 1981)). Finally, when a clause in a contract is unambiguous, a court should not disregard the letter of the clause under the pretext of pursuing its spirit. Cashio v. Shoriak, 481 So.2d 1013, 1015 (La. 1986) (citing La. Civ. Code. Ann. art. 2046 cmt. (b)).

With these principles of Louisiana contract interpretation in mind, we turn to the relevant ROFR provisions. Paragraph (2) of that document requires OxyChem to provide a Notice of Offer in the event of a Disposition. Once provided with the Notice of Offer, CITGO would have the right to purchase, lease, or otherwise acquire the property for the same price or rental, and upon the same terms and conditions, as that specified in the Notice of Offer. Crucial to the resolution of this case is Paragraph (1)(b) of the ROFR which defines "Disposition." According to this paragraph, a Disposition includes "any sale, Lease, exchange, transfer, or other disposition whatsoever, whether of record or beneficial ownership . . . ." Aplt. App. at 109. In addition, Paragraph (1)(b)(ii) includes the "contribution of all or part of the Subject Property or interest therein to any partnership, corporation, joint venture, or other entity in which [OxyChem] owns an interest" as a Disposition. Id. Paragraph (1)(b)(ii) does contain an exception, however, that excludes "contributions to any entity in which [OxyChem] or any wholly-owned affiliate thereof owns . . . at least a 50 percent interest." Id. Finally, Paragraph (1)(d) provides that a "Lease" includes any type

of "lease, rental or other occupancy agreement . . . with a term (including any renewal or extension options) longer than five (5) years . . . ." Id. at 111.

CITGO raises essentially two arguments in this appeal: (1) the May MTA, taken as a whole, constitutes an "occupancy agreement" for a term greater than five years and therefore qualifies as a Disposition triggering CITGO's right of first refusal, and (2) the May MTA, when viewed in light of the March MTA, lacks any difference from that abandoned transaction such that it is in substance the same transaction, *viz.*, a contribution to Equistar in which OxyChem has only a 29.5% ownership interest, and therefore constitutes a Disposition under the ROFR.

CITGO asserts that the five-year lease in conjunction with the subsequent operating agreement, which grants Equistar continued occupancy and control over the plant, constitute an "occupancy agreement" as stated in the ROFR. Because the term of the lease and operating agreement taken together exceed five years, so CITGO's argument goes, the arrangement constitutes an occupancy agreement exceeding five years and thus falls within the "Lease" component of a Disposition. The district court rejected this argument, concluding that CITGO had failed to cite any case defining the term "occupancy agreement" to include the use of property that performance of an operating agreement would necessitate. We agree. In each case that CITGO cites to support its reading of "occupancy

agreement" the respective court addressed the scope of the term "occupant" as used in particular statutes. See Reed v. Employers Mut. Cas. Co., 741 So.2d 1285, 1288 (La. Ct. App. 1999) (defining the term "occupant" as used in the Louisiana Recreational Use Statute "to have the meaning that best conforms to the purpose of the law") (citing La. Civ. Code Ann. art. 10); Stroughter v. Shepherd, 207 So.2d 865, 867 (La. Ct. App. 1968) (interpreting "occupant" as used in a Louisiana procedural statute for summary eviction); see also Smith v. Sno Eagles Snowmobile Club, Inc., 823 F.2d 1193, 1197 (7th Cir. 1987) (defining "occupant" for the purposes of the Wisconsin recreational use statute). We find CITGO's attempt to force these statutory constructions of the term "occupant" into the provisions of the ROFR unavailing. Given that operating agreements typically include provisions "giving the operator full control of the premises," 2 Williams & Meyers, Oil and Gas Law, § 503.2, at 582.1 (2000), we think the drafters of the ROFR would have done more to include operating agreements within the definition of "Lease" than rely on a strained interpretation of the term "occupancy agreement."

In its second argument, CITGO asserts that despite its form, the May MTA is in substance the same transaction as the March MTA. Because, according to CITGO, Louisiana law never allows form to trump substance, we should look to the economic substance and practical effect of the May MTA and determine that it

does not fall within any of the ROFR's exceptions. Subsumed within this assertion are CITGO's claims that a reasonable jury could conclude that the May MTA was a sham designed to mask the true effect of the transaction, and that the district court's interpretation of the contract renders the Disposition clause a nullity. OxyChem counters that CITGO never raised its economic substance argument in the district court and that we should therefore decline to consider it. See Tele-Communications, Inc. v. Comm'r, 104 F.3d 1229, 1232 (10th Cir. 1997) (appellate courts generally will not consider an issue raised for the first time on appeal). The district court, however, addressed this argument specifically in its order. See Aplt. Br. ex. 1, at 8 ("CITGO asserts that . . . the May MTA must be read in conjunction with the March MTA . . . the five-year lease and the operating agreement [which] taken together, fall within the general definition of a 'Disposition.'"). It was clear to the district court that CITGO had raised this argument and we therefore reject OxyChem's claim that the argument is waived.

CITGO begins with the proposition that Louisiana courts "look at the substance and essence of contracts, rather than their form." Tete v. Lanaux, 14 So. 241, 243 (La. 1893). While we may agree with this general principle, the cases that CITGO cites to support the force of the rule in this case are simply inapposite. In McCarthy v. Osborn, 65 So.2d 776 (La. 1953), the defendants attempted to evade a right of first refusal by labeling a transfer of stock in

exchange for money as a "merger." Id. at 778. The court held that because the defendants received no stock interest in the "merged" corporation, the transfer did not meet the definition of a merger and therefore triggered the right of first refusal. Id. at 778–79. Similarly, in Gorum v. Optimist Club of Glenmora, 771 So.2d 690 (La. Ct. App. 2000), the court held that a *dation en paiement* (where a creditor accepts a debtor's payment of a debt in some form other than money) was in effect a sale and therefore triggered a right of first refusal. Id. at 695 (stating that drawing a distinction between a sale and a *dation en paiement* would "circumvent [the] obligation simply on the basis of semantics"). Finally, in Waguespack-Pratt, Inc. v. Ten-O-One Howard Ave., Assoc., 449 So.2d 657 (La. Ct. App. 1984), the court determined that a real estate broker was entitled to a commission based upon a ten-year lease term despite the fact that the lease in question was facially a three-year lease, but with extensions effectively providing for a ten-year lease. Id. at 661–62. In Waguespack, however, the court took the lease extensions into account because the contract "did not manifest what was mutually assented to by the parties." Id. at 661. Here, we agree with the district court that the terms of the ROFR are "clear and unambiguous" and we therefore look to the words of the contract to ascertain the parties' intent. See La. Civ. Code Ann. art. 2045.

In none of these cases did the respective court attempt, as CITGO would

- 11 -

have us do, to place a different meaning on contractual terms supplied by the contract itself. We think it important at this juncture to point out that Louisiana courts will not "place a strained construction" on contract provisions where the parties involved are "sophisticated" parties. Piazza v. Avis Leasing Corp., 469 So.2d 1142, 1144 (La. Ct. App. 1985); Cal. Union Ins. Co. v. Bechtel Corp., 473 So.2d 861, 866–67 (La. Ct. App. 1985) (stating that "two highly sophisticated" parties "are free to bargain as they see fit and are bound by their contracts"). Here, two sophisticated parties, by virtue of the contract provisions, defined the substance of the contractual term "Disposition" and we see no reason to usurp that definition with our own interpretation merely because CITGO claims essentially: "That's not what we meant."

One case that CITGO cites does merit extra attention. In Fina Oil & Chem. Co. v. Amoco Prod. Co., 673 So.2d 668 (La. Ct. App. 1996), the defendant transferred a lease interest to a wholly-owned subsidiary. Although the lease interest was subject to a right of first refusal, the contract exempted transfers to subsidiaries. Id. at 671. When the defendant sought to sell the subsidiary to a third party, the plaintiff sued on the grounds that the stock sale triggered its right of first refusal. Id. at 670. In concluding that the stock sale did not trigger the right of first refusal, the court stated that when determining whether a particular transaction triggers preferential rights, the court should "'place[] emphasis on

either the presence or absence of arm's length dealing . . . or upon the effect of the conveyance as placing the property beyond the reach of the holder of the right.'" Id. at 672 (quoting Harlan Abright, Preferential Right Provisions and their Applicability to Oil and Gas Instruments, 32 Sw. L.J. 803, 811 (1978)). The Fina court stated further that "'an absence of arm's length dealing in transactions is . . . generally held to preclude the application of preferential right provisions.'" Id. (quoting Abright, supra). When it applied Fina to this case, the federal district court found that an arm's length transaction did indeed exist and, contrary to the language in Fina, concluded that CITGO's reliance on that case was misplaced. Aplt. Br. ex. 1, at 14. Although the district court may have reversed the meaning of Fina's language regarding arm's length transactions, we find nonetheless that the presence of such a transaction does not necessarily trigger CITGO's rights under the ROFR. Because the contract allows a contribution of the property to an entity only 50 percent owned by OxyChem, it obviously contemplates the possibility of some sort of arm's length transaction.

Further, the May MTA has not resulted in putting the Lake Charles Facility beyond the reach of CITGO's rights under the ROFR because the possibility that the LC Partnership might convey the property still exists. Cf. Quigley v. Capolongo, 383 N.Y.S.2d 935, 936–37 (App. Div. 1976) (right of first refusal triggered where lease contained a covenant preventing the owner from

- 13 -

transferring or selling the underlying property); <u>Wellmore Builders, Inc. v. Wannier</u>, 140 A.2d 422, 428–29 (N.J. Super. Ct. App. Div. 1958) (easement with provision preventing sale of the property triggered right of first refusal). CITGO claims that such a result has obtained because the LC Partnership agreement provides Equistar with veto power due to the provision requiring mutual agreement of the partners regarding decisions to convey property worth more than $30 million. That may be, but the ROFR itself provides that the property could be contributed to any entity as long as OxyChem retains only a 50 percent interest. Thus, had OxyChem contributed the Lake Charles Facility directly to a corporation with OxyChem retaining only 50% ownership, this same veto power would exist (assuming equal voting rights). CITGO would be hard-pressed to claim that such a contribution would trigger the notice provisions of the ROFR.

CITGO claims that OxyChem's only business purpose for the restructuring of the March MTA was to evade CITGO's rights pursuant to the ROFR. Be that as it may, CITGO fails to cite any case where a court precluded a party from taking advantage of an explicit and bargained-for contractual provision. Although CITGO cites <u>Delta Truck & Tractor, Inc. v. J.I. Case Co.</u>, 975 F.2d 1192 (5th Cir. 1992), for the proposition that a party to a contract cannot do indirectly that which it cannot do directly, the case is distinguishable. In <u>Delta Truck</u>, International Harvester had a number of dealer agreements for agricultural

equipment that prevented it from terminating the contracts without cause. Id. at 1194–95. International Harvester eventually sold its agricultural equipment business to Case pursuant to a sales contract that allowed Case to terminate the dealer agreements in a manner that would not have been allowed under the original International Harvester/Dealer agreements. Id. at 1200–02. Thus, Delta Truck involved a party to a contract attempting to *avoid* a contractual provision. In the case before us, OxyChem has maneuvered to fit within an explicit contractual provision. We fail to see how its efforts to toe the line of the ROFR's terms should be considered a sham.

Finally, CITGO claims that the district court's interpretation of the ROFR Disposition clause renders it a nullity because OxyChem could simply arrange any transaction in a similar manner by using operating agreements to transfer control without transferring ownership and thereby avoid the ROFR. First, the clause is not a complete nullity because a dissolution of the LC Partnership or an outright sale of the Lake Charles Facility will trigger CITGO's rights under the ROFR. See Aplt. App. at 122 (ROFR, Par. 10) (stating that right of first refusal will continue as a covenant running with the property in the event of a non-Disposition transfer). Second, had control of the Lake Charles Facility been CITGO's true concern, as opposed to ownership, it could have included a change-of-control provision in the agreement that would have triggered its preferential rights. See

<u>Tenneco, Inc. v. Enter. Prod. Co.</u>, 925 S.W.2d 640, 646 (Tex. 1996).

The district court correctly granted OxyChem's motion for summary judgment and denied CITGO's cross-motion.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge